UNITED STATES, Appellee,

v.

James R. POWELL, Chief Warrant
Officer Two, U.S. Army,
Appellant.

No. 97–0436.
Crim.App. No. 9401897.

U.S. Court of Appeals for
the Armed Forces.

Argued May 12, 1998.

Decided Sept. 29, 1998.

For Appellant: *David P. Sheldon* (argued); *Eugene R. Fidell, Joseph E. Cazenevette, Mary Price,* and *Captain Mary J. Bradley* (on brief).

For Appellee: *Captain Elizabeth N. Porras* (argued); *Colonel Joseph E. Ross* and *Lieutenant Colonel Frederic L. Borch, III* (on brief); *Captain Robert F. Resnick.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of assault with intent to commit rape and unlawfully communicating a threat, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The court-martial sentenced appellant to a dismissal, confinement for 20 years, and forfeiture of $1,857 pay per month for 240 months. The convening authority approved the dismissal, but reduced the confinement to 18 years and the duration of the forfeitures to 216 months. The Court of Criminal Appeals affirmed the findings and sentence to a dismissal, but reduced the confinement to 6 years and the duration of the forfeitures to 72 months.

This Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE RULED THAT THE TESTIMONY OF A KEY DEFENSE WITNESS WAS IMMATERIAL BASED UPON A PROFFER MADE AT TRIAL BY GOVERNMENT COUNSEL THAT CONFLICTED WITH A PROFFER OF EXPECTED TESTIMONY MADE BY THE DEFENSE COUNSEL.

II

WHETHER THE MILITARY JUDGE ERRED IN NOT DISQUALIFYING GOVERNMENT COUNSEL BECAUSE THEY HAD POSTED BAIL FOR THE PROSECUTRIX ON THE EVE OF TRIAL.

For the reasons set out below, we resolve Issue I in appellant's favor and reverse. Accordingly, we need not and do not address Issue II.

*Facts Surrounding the Offenses*

Appellant became romantically involved with SC, who was separated from her husband, and she moved into appellant's home. At the time of trial, she was again living with her former husband.

On the night of June 19–20, 1994, appellant and SC had an altercation in their bedroom, which gave rise to the charges against appellant. The ensuing court-martial was a credibility battle between appellant and SC. The defense theory—to attack SC's credibility—was revealed in opening statements and consistently pursued throughout the trial.

Both appellant and SC testified that they attended a barbecue party at appellant's neighbor's house on the evening of June 19, 1994, accompanied by Bill Brown, SC's former brother-in-law, who was also appellant's friend and golfing partner. After the party, SC changed into a sleep shirt and fell asleep watching television in the living room, where appellant and Mr. Brown were watching television. Mr. Brown had missed his flight and intended to spend the night with appellant and SC. The testimony of SC and appellant differ about what happened thereafter.

SC testified that, after she fell asleep in the living room, appellant awakened her, and she walked to the bedroom and shut the door. SC testified that she awakened to find that appellant had removed her underwear, pushed her nightshirt up, and was having sexual intercourse with her. She testified she told appellant to stop and get off her, but appellant told her to shut up and said, "Oh, come on," and they started to struggle. She testified that she unsuccessfully tried to push appellant off, but that appellant covered her mouth and nose, choked her, hit her in the face and head, and continued his efforts to have intercourse with her. She testified that she eventually escaped and locked herself in the bathroom. She screamed, hoping that Mr. Brown would hear her. She broke a porcelain switch plate and told appellant that she had a piece of glass and asked him to move away from the bathroom door. She then ran out of the house to the neighbor's house and called the police. She told the police that appellant had been beating her and was going to kill her. When the police asked why, she told them, "[H]e wanted sex and when he didn't get it, he just lost his temper." She testified that she contacted a local magistrate, who told her that she could obtain a copy of the police report and take it to him, "and then they would swear out the warrant and have Mr. Powell arrested." SC also reported the incident to appellant's commander.

SC testified that she spent the night at her sister's house on Fort Campbell, Kentucky. SC testified further that, on the next day, appellant called her and told her, "I love you. I need to talk to you," but she told him to stop calling and she hung up. She testified that appellant called her about four times while she was staying with her sister.

SC testified that, because her mother and stepfather were coming to visit her sister, she left her sister's house and stayed with some friends on post. SC testified that she did not want to stay with her sister because she was embarrassed and did not want her parents to see her. She testified that, while she was staying with her friends, appellant visited her, apologized for his conduct, and asked SC to tell his commander that she had fabricated her report of his misconduct.

She testified that appellant told her that he knew she needed money and told her to use her Automatic Teller Machine (ATM) card to withdraw whatever she needed from their joint bank account. SC tried without success to withdraw money using the ATM card. She contacted appellant, and he offered to go with her to the bank to ensure that she would be able to use the ATM card. She reluctantly agreed. However, appellant did not drive to the bank but went to a restaurant. SC testified that appellant again asked her to tell his commander that she had "escalated an argument." She refused.

On cross-examination, SC admitted that she did not tell the police that appellant had raped her or penetrated her. She also admitted being alone with appellant when he suggested that they go to the bank regarding the ATM card, even though appellant had threatened to kill her on the night of 19–20 June. On redirect, she explained that she did not tell the police that appellant had raped her because she "didn't know if that's what it counts as when you're living with somebody, they know you've had sex with them before."

Appellant testified in his own defense. He admitted having an altercation with SC on the night of 19–20 June, but denied raping or attempting to have sexual intercourse with her on that night. He testified that he felt he was acting in self-defense.

Appellant testified that, before they went to the neighbor's barbecue party, SC became upset about the "phone issue." Appellant

had changed the long-distance access code on his telephone but had not given SC the code "because of previous ˙high phone bills." When Mr. Brown attempted to make a long-distance call, appellant revealed that SC did not have the code. This revelation apparently embarrassed her.

While appellant, SC, and Mr. Brown were watching television, appellant asked Mr. Brown if he would pick up and return some furniture that SC had removed from the house and transported to her ex-husband's home in Woodbridge, Virginia. Mr. Brown agreed, but SC was again embarrassed by the conversation.

Appellant testified that, after the party, SC changed into a nightshirt and fell asleep on the floor while appellant and Mr. Brown were watching a soccer match on television. Appellant testified that he tried to awaken SC because he "didn't think that it was appropriate for [SC] to lay there on the floor in her nightshirt." He testified that, when he attempted to awaken her, she said, "Leave me alone." Finally, he picked her up and stood her on her feet, walked with her to the bedroom and laid her on the bed, and then returned to the living room to watch television.

Appellant testified that, when he went to bed, SC began shoving him and saying, "You son-of-a-bitch, you're just trying to embarrass me in front of my family." Appellant testified that he "asked her to stop and just to sleep it off," but she continued shoving him. He testified that he "started getting upset," and he rolled over on top of her "to try to calm her down," but she became more angry. He testified that he was holding her down, but she was kicking him in the groin, pulling his hair, and scratching his face. Appellant testified that he "blew up." He got off SC and told her "I want you to leave my house. This has gone on too long." On cross-examination, appellant admitted that he might have said, "Get the hell out of my house," and might have called SC a "bitch." SC got out of bed and locked herself in the bathroom.

Appellant testified that he awakened Mr. Brown, told him that he and SC had a fight, and asked Mr. Brown to persuade SC to come out of the bathroom. As Mr. Brown and appellant walked toward the bathroom, she came out and went out the front door of the house. Appellant testified that, at that time, he noticed a cut above her lip.

Appellant testified that, after the police arrived, he avoided them because he was afraid of being arrested, because of SC's appearance. After his commander called him into the office and read him his Article 31 [1] rights, appellant called SC and asked her what she had told his commander. He testified that he told her, "Call him back and give him the truth." She refused. He admitted that he later asked SC again if she had called his commander "to revise her story to the truth."

On cross-examination, trial counsel attacked appellant's truthfulness. Trial counsel elicited admissions from appellant that, on two occasions, he responded untruthfully to questions from superior officers.

In closing argument, defense counsel asserted that SC's testimony was incredible. Trial counsel's closing argument conceded that "the bottom line in this case is credibility—who you believe and who you don't believe." Trial counsel's closing argument focused on appellant's credibility, calling attention to his efforts to avoid the police on the night of the ˙incident and his previous lies to his superiors. Trial counsel argued that appellant had lied before when he was facing trouble, and that he was lying again at his court-martial.

*Facts Pertaining to the Defense Witness*

Before trial, the defense requested that Ms. Sharon M be produced as a defense witness. An extract of the Article 32 [2] investigating officer's report containing Ms. M's testimony was attached to the defense request. At the Article 32 hearing, Ms. M testified that she worked as a bartender, and

---

1. Uniform Code of Military Justice, 10 USC § 831.

2. UCMJ, 10 USC § 832.

that she had known SC for about 5 months and saw her 3 times a week at the bar. She also testified that she had to stop serving SC on two occasions because of her degree of intoxication, and that on one occasion SC became hostile and abusive.

In response to the defense request, trial counsel subpoenaed Ms. M to appear as a witness. A member of the prosecution team telephonically spoke to Ms. M approximately 1 week before trial, and she said nothing to indicate that she would not comply with the subpoena. A member of the staff judge advocate's office testified that she had talked with Ms. M and informed her that her airline ticket and transportation from the airport had been paid for and that, when she arrived, she would be given a check for the cost of the motel and food.

When the trial began, Ms. M had not yet appeared. At an Article 39(a)[3] session before the trial on the merits began, defense counsel orally represented that Ms. M "can testify concerning her knowledge of the alleged victim's personality and her demeanor the week following the alleged offenses." Defense counsel also orally represented to the military judge that Ms. M would express an opinion on SC's truthfulness.

After the defense had presented as much of its case on the merits as possible, another Article 39(a) session was convened to determine the status of Ms. M. Trial counsel informed the military judge that he had spoken with Ms. M at her home in Kansas, that she was pregnant and experiencing premature labor contractions, and that she had been advised by her doctor not to travel. At this point, the military judge tentatively ruled that Ms. M was a material witness. The military judge also opined that Ms. M had presented a medical justification for not enforcing the subpoena. Defense counsel declined to contest the military judge's decision not to enforce the subpoena.

The military judge then told the parties, "We need to find an alternative to her live personal appearance." Defense counsel requested a continuance so that Ms. M's deposition could be taken at her home in Kansas.

Without ruling on the request for continuance, the military judge invited trial counsel to show that Ms. M's testimony was not relevant and necessary. The assistant trial counsel then informed the military judge that, in his telephonic conversation with Ms. M, she informed him that she did not know if she had an opinion about SC's truthfulness.

Defense counsel continued to represent that Ms. M would offer an opinion about SC's truthfulness. Defense counsel also represented that Ms. M would testify that she saw SC with male companions in a bar shortly after the alleged assault, and that SC was laughing and joking. Finally, defense counsel represented that SC asked Ms. M if she had seen appellant and also asked Ms. M to tell appellant that SC was looking for him. Defense counsel argued that this testimony contradicted SC's testimony that she was afraid of appellant, that she did not want to see him again, and that she "wanted to get out of town."

Upon questioning by the military judge, defense counsel stated that he had talked with Ms. M twice after the Article 32 investigation, but that he had not obtained an affidavit or any written statement from Ms. M to preserve her testimony.

The military judge then reversed his earlier tentative ruling and ruled that the proffered testimony of Ms. M was not material and relevant. He ruled that her testimony would have "minimal probative value," which "would be substantially outweighed by the danger of confusion of the issues and delay, again, in chasing down this witness's apparently varying story, which none of the parties have managed to properly preserve before trial." Accordingly, he did not require the Government to produce the witness; nor did he grant a continuance to permit the defense to produce Ms. M's testimony by other means. After the military judge announced his ruling, the defense rested.

### Discussion

Appellant now argues that the military judge abused his discretion by uncritically

accepting the prosecution's representations about Ms. M's expected testimony. He asserts that, when faced with contradictory proffers, the military judge should have granted a continuance to allow Ms. M to testify, either in person or by deposition. The Government argues that the military judge did not abuse his discretion because appellant failed to show the relevance and necessity of Ms. M's testimony.

The Fifth and Sixth Amendments to the Constitution give an accused the right to present the testimony of relevant witnesses. *United States v. Miller*, 47 MJ 352, 359 (1997). RCM 703(a), Manual for Courts-Martial, United States (1995 ed.), gives the prosecution and defense "equal opportunity to obtain witnesses and evidence, including the benefit of compulsory process." RCM 703(b) entitles both sides "to the production of any witness whose testimony on a matter in issue ... would be relevant and necessary." RCM 703(c)(2)(D) places the responsibility on the trial counsel to "arrange for the presence of any witness listed by the defense unless the trial counsel contends that the witness's production is not required under this rule." The Rule further provides: "If the trial counsel contends that the witness's production is not required by this rule, the matter may be submitted to the military judge."

We review a military judge's denial of a request for production of a witness for abuse of discretion. *United States v. Miller, supra.* A witness is "necessary" when the testimony "would contribute to a party's presentation of the case in some positive way on a matter in issue." *Id.,* quoting *United States v. Breeding*, 44 MJ 345, 350 (1996). A witness whose testimony is necessary and material must be produced or the proceedings abated, unless the testimony "would be merely cumulative to the testimony of other defense witnesses." *Miller,* quoting *United States v. Williams*, 3 MJ 239, 243 (CMA 1977).

Because an erroneous refusal to order production of a necessary and material witness violates the Fifth and Sixth Amendments, as well as RCM 703, we may not affirm unless we are satisfied beyond a reasonable doubt that the error was harmless. *United States v. Miller, supra.*

A military judge's ruling denying a request for continuance likewise is reviewed for abuse of discretion. RCM 906(b)(1) Discussion; *see United States v. Miller, supra; United States v. Royster*, 42 MJ 488 (1995); *United States v. Sharp*, 38 MJ 33 (CMA 1993). We will not reverse the military judge's ruling absent a clear abuse of discretion. *United States v. Thomas*, 22 MJ 57 (CMA 1986).

On the other hand, we have warned judges to be cautious when denying a continuance which will deprive a party of essential evidence. *United States v. Browers*, 20 MJ 356, 360 (CMA 1985). We have observed that "[w]itnesses ... are not fungible." *Royster*, 42 MJ at 490. If the military judge improperly denies a request for the production of a defense witness, then we must decide if the evidence of record "demonstrates beyond a reasonable doubt that the unadmitted testimony would not have tipped the balance in favor of the accused and the evidence of guilt is so strong as to show no reasonable possibility of prejudice." *United States v. Jefferson*, 13 MJ 1, 4, (CMA 1982), quoting *United States v. Lucas*, 5 MJ 167, 172–73 (CMA 1978).

Applying the foregoing principles to this case, we hold that the military judge abused his discretion. We disagree with the military judge's suggestion that defense counsel was at fault for not properly preserving Ms. M's testimony. Ms. M had testified at the Article 32 hearing, had been interviewed twice by defense counsel, and had been subpoenaed. Both sides expected Ms. M to appear as a witness. Defense counsel did not know that Ms. M would not appear and testify until the end of the defense case on the merits. Because trial counsel did not contest the materiality or necessity of her testimony before trial, and had issued a subpoena and made arrangements for her travel and lodging, defense counsel was entitled to expect her to be present for the trial.

If we take defense counsel's proffer at face value, Ms. M was a necessary and material witness. In a head-to-head credibility battle, she would opine that SC was untruthful. In support of appellant's assertion that SC initiated the physical altercation, Ms. M would testify that SC was belligerent and abusive after consuming alcoholic beverages. Contrary to SC's testimony that she was terrified that appellant would kill her, Ms. M would testify that SC was laughing and joking in a bar the day after the incident, and that she was trying to make contact with appellant. The Government offered nothing to contradict the defense proffer until late in the trial.

Even after the Government contested the defense proffer, defense counsel asked only for a continuance to allow the taking of a deposition. The Government offered no reasons why a continuance should not be granted. A deposition most likely would have resolved the conflicting proffers about Ms. M's expected testimony.

Given the factual posture of the trial, we hold that the military judge abused his discretion. The military judge's error was of constitutional dimension, depriving appellant of equal access to witnesses. We are not satisfied beyond a reasonable doubt that the error was harmless.

### Decision

The decision of the United States Army Court of Criminal Appeals is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Chief Judge COX and Judges CRAWFORD and EFFRON concur.

SULLIVAN, Judge (dissenting):

The case reversed by the majority today is a conviction for two very serious crimes. Appellant was convicted by a jury of assault with intent to commit rape and unlawfully communicating a threat. The jury under-

scored the serious nature of the convictions by giving appellant confinement for 20 years, forfeitures in the amount of $445,680 ($1,857 for 240 months), and dismissal from the armed forces.*

The majority reverses this serious case because of a "missing witness." But who was this key missing witness, and what did she offer the defense? The missing witness was Ms. M., a bartender. She did not witness the assault, but through her contact with the victim as a customer, formed some views of the victim's character and post-assault conduct. This civilian witness resisted all attempts to get her to testify. Finally, it came down to a judgment call by the trial judge who had an ongoing trial to run. Was this witness necessary and material or was the expected testimony not relevant and cumulative? The judge, in my view of the record, made the right call.

The record does not show that Ms. M was a necessary and material witness. Her purported testimony concerned the alleged victim's conduct, days after the charged offense, which would have circumstantial value only. In any event, it was cumulative of testimony from another witness, AW, who also testified concerning the alleged victim's post-assault conduct in a bar. As for this witness's opinion of the victim's character for truthfulness, I am not convinced of its admissibility or probative value. See United States v. Breeding, 44 MJ 345, 351 (1996). In these circumstances, I see no constitutional error or any abuse of discretion by the trial judge in refusing to order the Government to produce cumulative testimony. Id. at 350 (cited in United States v. Miller, 47 MJ 352, 359 (1997)). In sum, the record shows that the bartender's view was not necessary for a just trial in this case. The trial judge's decision and the decision of the court below are rooted in the firm ground of the facts in the record. The majority's opinion is built on sand and speculation. I would affirm.

---

* The jury's verdict survived two levels of review before today. Actions by the convening authority and by the court below affirmed the conviction but reduced this sentence to dismissal, confinement to 6 years, and forfeiture of $1875/month for 72 months.