**UNITED STATES**

v.

**Airman Basic Ashontia K. HARROW, United States Air Force.**

**ACM 35257.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 25 Jan. 2002.

Decided 31 Jan. 2006.

F. Spencer, Lieutenant Colonel Robert V. Combs, and Major John C. Johnson.

Before STONE, Senior Judge, GENT, and SMITH, Appellate Military Judges.

### OPINION OF THE COURT

STONE, Senior Judge:

A panel of officer and enlisted members convicted the appellant, contrary to her pleas, of the unpremeditated murder of her daughter, in violation of Article 118, UCMJ; 10 U.S.C. § 918. She pled guilty to 13 additional offenses, to include: multiple failures to go, absence without leave, making a false official statement, theft of insurance proceeds, fraud in obtaining phone services, dishonorable failure to pay just debts, and making false claims to secure the approval of a loan. These offenses violated Articles 86, 107, 121, and 134, UCMJ, 10 U.S.C. §§ 886, 907, 921, 934. The court members' adjudged sentence included a dishonorable discharge, confinement for 25 years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

The appellant assigns eight errors: (1) Whether the record of trial is incomplete and not substantially verbatim; (2) Whether the military judge erred in not admitting extrinsic evidence of a prior inconsistent statement to impeach a key government witness; (3) Whether the evidence is legally and factually sufficient to support the appellant's murder conviction; (4) Whether the military judge erred in admitting expert testimony; (5) Whether the military judge erred in admitting uncharged misconduct evidence; (6) Whether one of the government's expert witnesses abandoned her neutral role and provided a biased and unreliable opinion based upon insufficient facts or data; (7) Whether the appellant's pleas of guilty to three offenses were provident; and (8) Whether the appellant received ineffective assistance of counsel.[1]

Having carefully reviewed the record of trial, the written submissions of the parties,

Appellate Counsel for Appellant: Captain Christopher S. Morgan (argued), Colonel Beverly B. Knott, Colonel Carlos L. McDade, Major Terry L. McElyea, and Major Antony B. Kolenc.

Appellate Counsel for the United States: Captain C. Taylor Smith (argued), Colonel LeEllen Coacher, Lieutenant Colonel Gary

---

1. This last issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

and the excellent oral arguments of counsel,[2] we hold that the appellant's guilty pleas to one of the specifications was improvident, and therefore set aside and dismiss that finding and reassess the sentence. The remaining assignments of error are without merit. We discuss most of them below.

### Factual Background

This case involves the death of Destiny Harrow, the appellant's five-month-old daughter. Expert testimony established that Destiny died as the result of abusive head trauma, more commonly referred to as shaken baby syndrome. She sustained blunt force trauma to her brain and the left side of her face on the morning of 23 June 2000, and suffered significant hemorrhaging of the brain and eyes. She died approximately five months later. At trial, the cause of death was uncontested. The central evidentiary issue was whether the injuries were caused by the appellant or by Destiny's biological father, Antonio Jackson.

Prior to her death, Destiny lived in government housing on Eglin Air Force Base, Florida, with the appellant. Mr. Jackson, who lived out of state, was visiting the appellant for a few days and staying in her on-base apartment. On the morning of 23 June 2000, the appellant went to work, leaving Destiny with Mr. Jackson. Between 1045 and 1130 hours, the appellant came home for lunch. She departed at approximately 1455 hours. Although the record does not address everything that happened during this period, certain events are clearly established.

The appellant's next-door neighbors, Mr. and Mrs. Harris, testified about what they saw and heard that day. Mrs. Harris testified that the morning was quiet. In the afternoon she heard the appellant "yelling and arguing, loud screaming, cursing, [and] very bad language" for about 30 to 45 minutes. Mrs. Harris did not hear Mr. Jackson at all, but heard Destiny crying for about 10 minutes, and then heard a "loud, hard bang" against the wall adjoining their two apartments. She testified, "My picture fell off. And I didn't hear [Destiny] cry anymore. I heard her whimper twice and that was it."

About five minutes after hearing the bang against her wall, Mrs. Harris saw the appellant leave the apartment and drive off. Mrs. Harris described the appellant's face as "very angry and very raged," and she testified the appellant slammed the front door so hard the Harris doorbell rang. She said the appellant went to her car, slammed the door, and "drove away real fast. She spun her tires out [so] that you could hear the gravel hit the sidewalk." Mr. Jackson came over to her apartment "within a minute" after the appellant's departure, in great distress, holding Destiny and asking for assistance.

Mr. Harris provided similar testimony. He noted that their apartments were very small and had extremely thin walls. He said he also heard "thumps" and the appellant "yelling" for about 30 minutes. He then heard a door slam and saw the appellant "spin out" of the driveway in her car. A "short time" later, he testified, Mr. Jackson came over with Destiny and asked him to call an ambulance. Mr. Jackson could not call 911 from the appellant's apartment because she did not have a telephone.

Mr. Jackson also testified about the events of that day. He said the appellant rested on the couch for a period of time. At one point, he went to the bathroom to shave. He testified the appellant began "fussing," "arguing," "spitting," "yelling," and "screaming" at him. In order to avoid a confrontation, he moved into the living room, where Destiny was sitting on the couch. The appellant grabbed Destiny off of the couch and held her by the arm as she walked around the room. She held Destiny this way throughout the argument. When Mr. Jackson told the appellant not to take her anger out on Destiny, the appellant told him, "No, this is my baby. I do what I want with my baby." To avoid further angering the appellant, he testified he then returned to the bathroom, locked the door, turned up the radio, and sat down on the toilet seat. He could still hear the appellant "screaming," things hitting the walls, and doors slamming. He also remembered hearing a knock on the door. When it was

---

**2.** As part of this Court's Project Outreach Program, we held oral argument on Issues (1) and (2) at the Air War College, Maxwell Air Force Base, Alabama.

quiet, he left the bathroom and walked to the front door and saw the appellant pulling out of the driveway and speeding off.

Mr. Jackson then turned from the front door and saw Destiny lying quietly on the couch. He found Destiny's bottle and laid it in her hand. As he headed back to the bathroom to finish shaving, he said he almost immediately heard a "gargling" noise coming from Destiny. He went over to her and saw she had a thick, pasty vomit coming out of her mouth. He picked her up, turned her over, patted her on the back and saw additional vomit coming out of her mouth. At this point, he testified, she started shaking and her back arched. All he could see were the whites of her eyes. She then went limp. Expert testimony indicated this description fit the classic symptoms of a tonic seizure, which probably would not occur until more than two to three minutes after a severe shaking incident. In other words, it would be unlikely for a tonic seizure to be the first and most immediate symptom of a baby that had been severely shaken.

Mr. Jackson testified he "immediately" ran next door to call 911. He testified that only a "few minutes" elapsed between the time the appellant sped off and the time he knocked on the Harris door.

Neither Mr. Jackson nor the Harrises observed a visit to the appellant's apartment by Senior Airman (SrA) Warren, a patrolman assigned to Security Forces. He was on patrol that day when he received a dispatch to go to the appellant's home and advise her to contact her unit first sergeant. This was not an unusual event. Because the appellant did not have a phone in her apartment, the first sergeant used this method to contact her. The appellant told him she had been to an appointment and was on her way back to work. SrA Warren testified she did not appear angry, flushed, or excited and that she held Destiny on her left hip while standing in the door. He was within an arm's length of the appellant and Destiny and observed no signs of a struggle and heard no shouting, yelling, slamming, or throwing. He made eye contact with Destiny, who

seemed "responsive." Upon delivering the first sergeant's message, he departed.

Based upon police and ambulance dispatch records, SrA Warren's testimony, and the appellant's statements to investigators, the following chronology covers the 13–minute period from 1445 to 1458:

1445 hours—SrA Warren dispatched to deliver a message to the appellant

1450 hours—Approximate arrival of SrA Warren

1451 to 1452 hours—Approximate departure of SrA Warren

1456 to 1457 hours—Approximate departure of the appellant [3]

1458 hours—911 call from the Harris apartment

Law enforcement officials interviewed the appellant four times. In her first interview she attempted to explain Destiny's injuries by saying it was probably an accident at the hands of Mr. Jackson. She claimed Mrs. Harris had told her that when Mr. Jackson brought Destiny over to her apartment to call 911, he shook Destiny vigorously trying to get a response—so vigorous, in fact, that Mrs. Harris had to tell Mr. Jackson to put Destiny down. Upon interviewing Mrs. Harris, investigators learned she had never witnessed Mr. Jackson shaking Destiny and, more importantly, she had never made such a statement to the appellant. Consequently, investigators began focusing on the appellant as the primary suspect.

In the second interview, the appellant admitted to investigators that she argued with Mr. Jackson for 20 to 30 minutes, but was adamant that she was not angry or frustrated. She told investigators Mr. Jackson was in the bathroom when SrA Warren came to the door and when she left the apartment. She also said she might have caused Destiny's injuries while tossing her in the air playfully or as she "jerked" around quickly after talking with SrA Warren. She also told investigators that Destiny was not crying when she left the apartment.

3. In discussions with investigators afterwards, the appellant said she left her apartment approxi- mately five minutes after SrA Warren arrived at the apartment.

### Omissions in the Record of Trial

During the course of the government's case-in-chief, the court reporting equipment malfunctioned. Approximately 15 to 20 minutes of Mr. Jackson's testimony was lost. His direct and cross-examination were recorded, but the government's redirect and his responses to the court members' questions were not. Additionally, discussions concerning a government request to admit evidence went unrecorded.

The appellant contends the record of trial is incomplete and not substantially verbatim, as required by Rule for Courts–Martial (R.C.M.) 1103(b)(2)(B), because of the partial loss of Mr. Jackson's testimony and the complete loss of the motion argument and ruling by the military judge. She asks that we disapprove her dishonorable discharge and any confinement in excess of six months. The government agrees that the omissions from the record were substantial, but contends the record is adequate to rebut any presumption of prejudice. If this Court were to determine prejudicial error as the result of the omissions, the government argues the proper remedy is to dismiss the affected charges without prejudice.

■■■ Whether a record of trial is incomplete is a question of law we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F.2000). Records of trial that are not substantially verbatim or are incomplete cannot support a sentence that includes a punitive discharge, confinement in excess of six months, or forfeiture of pay for more than six months. R.C.M. 1103(b)(2)(B). *See also* Articles 19 and 54(c)(1), UCMJ, 10 U.S.C. §§ 819, 854(c)(1). The requirement that a record be complete and substantially verbatim is one of jurisdictional proportion that cannot be waived. *Henry*, 53 M.J. at 110; *see also United States v. Whitney*, 48 C.M.R. 519, 1974 WL 13848 (C.M.A.1974).

■■ Failure to comply with R.C.M. 1103(b)(2) "does not necessarily require reversal." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F.1999). However, a substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the government must rebut.

*United States v. McCullah*, 11 M.J. 234, 237 (C.M.A.1981). In *McCullah*, our superior court concluded that the issue of what constitutes a substantial omission is reviewed on a case-by-case basis. *Id.*

### a. Mr. Jackson's Testimony

■■ The trial participants agreed that Mr. Jackson's testimony could be reconstructed without the presence of the court members. Mr. Jackson was present and answered questions anew. The trial counsel repeated her redirect examination, and the military judge repeated the questions posed by the members. The military judged worked through the discrepancies the parties noticed and gained their assent to the modifications. Both sides asserted they were satisfied the reconstruction was accurate.

The government claims the record was adequately reconstructed so as to rebut any presumption of prejudice. A number of considerations support this position:

1. The omission was noticed immediately, and reconstruction efforts began while the testimony was still fresh in everyone's mind;

2. The military judge, three trial counsel, three defense counsel, the appellant, and the witness were present during the reconstruction;

3. The judge, the parties, and the witness took an active role in the reconstruction;

4. The parties and the judge relied not only on their recollection of the testimony, but also the notes they took while Mr. Jackson testified;

5. No one objected; and

6. The judge, counsel, and the appellant agreed the reconstruction was adequate.

On the other hand, the appellant highlights the critical, qualitative nature of Mr. Jackson's testimony. She also suggests that the military judge should have followed the methodology endorsed in *United States v. Watts*, 22 M.J. 909, 910 (A.F.C.M.R.1986), for correcting recording errors. Specifically, she believes the military judge should have instructed the court members to disregard Mr. Jackson's lost testimony and then recalled

him to the stand to repeat the missing portions in front of them.

▮ Our careful review of the reconstructed testimony leads us to conclude that the government has overcome the presumption of prejudice as to Mr. Jackson's testimony. In addition to the considerations listed above, we note that the parties were meticulous in their re-creation of this critical evidence. Both sides frequently referred to their notes and modified Mr. Jackson's responses when they identified deviations or additions from his earlier testimony. Moreover, the court members' questions were in writing, and the military judge had the benefit of posing the exact questions initially addressed to Mr. Jackson. Further, we note that although the reconstruction was not done in front of the court members as suggested in *Watts*—the preferred method of dealing with such omissions—failure to do so is not dispositive. *See United States v. Griffin,* 17 M.J. 698, 699 (A.C.M.R.1983) ("The method of reconstruction is not a matter of principal concern").

### b. The Motion

▮ At trial, it appears the parties believed the argument on the government's motion to admit evidence had been preserved, thus they made no effort to reconstruct it. Further, when it came time to authenticate the record of trial and take final action, no one addressed the omission.

Commendably, current court-martial practice does not involve the use of unrecorded sidebar conferences, but earlier in our history they were more routine and led to a fair amount of litigation. We find the current situation very similar to that of an unrecorded sidebar conference, and thus turn to that body of law for guidance. "Not every sidebar conference must be recorded verbatim, but one involving a ruling by the judge *affecting rights of the accused* at trial must be fully recorded if the transcript is to be verba-

tim." *United States v. Gray,* 7 M.J. 296, 298 (C.M.A.1979) (quoting *United States v. Sturdivant,* 1 M.J. 256, 257 (C.M.A.1976) (per curiam)) (emphasis added); *see also United States v. Richardson,* 45 C.M.R. 157, 1972 WL 14146 (C.M.A.1972).

Because the government has conceded that this omission was substantial, we will only address whether the government has overcome the presumption of prejudice. We conclude the government has met that burden.

When the parties went back on the record after learning of the equipment malfunction, the judge said, "[T]he last thing that was recorded that could be detected was there had been a [government] motion for an admission of a prior consistent statement by Mr. Jackson. During a [session held pursuant to Article 39, UCMJ, 10 U.S.C. § 839], I went ahead and ruled against that particular motion." Thus, based solely upon the record, we do know the general nature of the evidence and the judge's ruling on it. *Cf. United States v. Desciscio,* 22 M.J. 684 (A.F.C.M.R.1986). The military judge ruled in favor of the appellant, and even after considering the trial defense counsel's posttrial affidavit, we are confident the appellant's interests were not prejudiced by the omission from the record.[4] *See generally United States v. Simmons,* 54 M.J. 883, 887 (N.M.Ct.Crim.App.2001).

### Impeachment of Mr. Jackson with Prior Inconsistent Statements

▮ The appellant next argues the military judge erred when he denied her the opportunity to impeach Mr. Jackson with extrinsic evidence of prior inconsistent statements pursuant to Mil. R. Evid. 613(b). According to the appellant, two aspects of Mr. Jackson's testimony were inconsistent with statements he made to investigators. Only one merits discussion—whether Mr. Jackson's in-court testimony was inconsistent

---

4. In his affidavit, the trial defense counsel suggests that the government made comments about the proffered testimony in front of the court members. He states he cannot recall whether or not he asked the judge for a limiting instruction, which was his "usual practice" under such circumstances. Even after making all reasonable inferences in favor of the appellant, as required

by *McCullah,* 11 M.J. at 237, we conclude his claim that he may have requested a limiting instruction is simply too speculative. Indeed, we find it more likely than not that the trial defense counsel is referring to an earlier, verbatim ruling where the trial counsel brought up Mr. Jackson's written statement, yet trial defense counsel did *not* ask for a limiting instruction.

with a statement that Destiny was crying immediately after the appellant left the house.

For the defense, this was a key point given their theory of the case—that it was "more likely" Mr. Jackson who was responsible for shaking Destiny. Because expert testimony indicated an infant's crying often triggers inappropriate shaking, the defense argued Destiny's crying might have caused him to shake her out of frustration or in an effort to quiet her. Further, if Destiny was crying at this juncture, it may have indicated she was in a "lucid interval," a mental status that may have been medically inconsistent with the onset of a tonic seizure almost immediately after the appellant's departure.

Trial defense counsel cross-examined Mr. Jackson extensively about whether Destiny was crying when the appellant left the house. Mr. Jackson said he could not remember making a statement to that effect to investigators. Even after efforts to refresh his recollection, he did not remember saying the child was crying at that point in time. The trial defense counsel's proffer as to the inconsistent statement was that Mr. Jackson had told investigators that Destiny was "crying after [the appellant] left, and furthermore that he described the cry as 'crying as if she missed her mother because she had just left.'"

Mil. R. Evid. 613(b) states, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." If the witness admits the inconsistency, then extrinsic evidence is generally not admissible. If the witness denies making the statement, or equivocates, Mil. R. Evid. 613(b) authorizes the admission of these statements. *United States v. Meghdadi,* 60 M.J. 438, 444 (C.A.A.F.2005). However, such evidence is considered only for credibility purposes, not to establish the truth of the

matter, i.e., it is admissible for impeachment rather than substantive purposes.[5]

As a preliminary matter, however, the proponent of the evidence must establish an inconsistency between the in-court and out-of-court statements. At trial, the military judge concluded that a failure to remember was not an inconsistency. He also concluded that Mr. Jackson never "denied that she was crying." Based upon these determinations, the military judge excluded the investigator's testimony.

We will review his findings of fact and application of these facts to the law for an abuse of discretion. *United States v. Gore,* 60 M.J. 178, 187 (C.A.A.F.2004). This "standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *Id.* This is a strict standard requiring more than a mere difference of opinion. *United States v. McElhaney,* 54 M.J. 120, 130 (C.A.A.F.2000). A military judge must be accorded reasonable discretion in determining whether a claim of faulty memory is inconsistent with statements previously given. *United States v. Insana,* 423 F.2d 1165, 1170 (2d Cir.1970).

In *United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A.1993), the Court of Military Appeals noted, in dicta, that an assertion of an inability to recall is a sufficient basis to establish an inconsistency, stating: "[W]hether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position." *But cf. United States v. Grubbs,* 776 F.2d 1281, 1287 (5th Cir.1985) (a claim of faulty memory does not constitute an inconsistent statement).

Looking at Mr. Jackson's testimony broadly and in context, it would have been reasonable to determine his testimony at trial was inconsistent with his prior statement to investigators and that Mr. Jackson's responses to trial defense counsel's questions amounted to a denial or equivocation. But given the deference we apply when reviewing an evi-

---

**5.** However, if the evidence otherwise qualifies under Mil. R. Evid. 801(d)(1)(A), the evidence would be admissible as substantive evidence.

dentiary ruling, we cannot conclude the military judge was unreasonable, and therefore abused his discretion by concluding otherwise.

■ Moreover, even if we assumed the military judge erred in not allowing the appellant to put on extrinsic evidence on this point, we do not find substantial prejudice to the appellant's material rights. Article 59(a), UCMJ, 10 U.S.C. § 859(a). The appellant argues we must apply constitutional harmless error because her Sixth Amendment right to confront a witness was violated. If this were the case, we would reverse unless the government established that error was harmless beyond a reasonable doubt. But this stricter standard of review is appropriate only when cross-examination is limited "in a manner that precludes an entire line of relevant inquiry." *United States v. Israel,* 60 M.J. 485, 488 (C.A.A.F.2005). We will assess prejudice in this case by applying a harmless error analysis because the "relevant inquiry" was limited only as to extrinsic impeachment, not intrinsic impeachment.

The government's evidence, generally, was very strong. But on this point, it was overwhelming. The appellant herself told investigators that the baby stopped crying before she left. Ms. Harris also testified that Destiny stopped crying immediately after hearing a bang that knocked a picture off her wall and prior to the appellant's departure.

Additionally, the defense's cross-examination had already effectively impeached Mr. Jackson. When he failed to recall making the statement to investigators, trial defense counsel produced Mr. Jackson's written statement and had him review it in front of the members in an effort to refresh his recollection. Trial defense counsel also questioned him about the notes investigators made of the interview. The clear import of these trial tactics was that Mr. Jackson's statement did include a comment that Destiny cried after the appellant left the house. Thus, the defense successfully impeached Mr. Jackson's testimony *intrinsically* by referring to the written and verbal statements he made to investigators and attempting to refresh his recollection. Trial defense counsel used this impeachment extensively and

effectively in his closing argument. The presentation of testimony from the investigator would not have added significantly to the impeachment of Mr. Jackson or substantially furthered the defense's theory of the case.

Finally, even assuming Mr. Jackson did tell investigators that Destiny was "crying as if she missed her mother," such a description is ambiguous—it could describe a cry that is either a soft "whimper" or a vigorous wailing. Consequently, the excluded testimony is subject to varied interpretation, and thus its overall "materiality" and "quality" is rendered debatable. *See generally United States v. Kerr,* 51 M.J. 401, 405 (C.A.A.F. 1999).

In view of these circumstances, we have no difficulty in concluding any error in excluding this evidence was harmless. *See Id.*

### Profile Evidence

■ Next the appellant contends that the military judge erred in allowing one of the government's expert witnesses to present "profile" evidence concerning a typical child abuser. Specifically, he challenges expert testimony from Dr. Sharon Cooper, a forensic pediatrician. Dr. Cooper testified that:

1. Biological parents are the most common people to fatally abuse their children;

2. The highest level of fatal child abuse is in infants under the age of 12 months;

3. The most significant trigger for a baby shaking incident is "persistent crying"; and

4. Medical professionals consider certain behavioral factors to determine if an injury is accidental or "inflicted."

The appellant did not raise this issue at trial, and thus we review for plain error using the three-part analysis established in *United States v. Powell,* 49 M.J. 220, 225 (C.A.A.F. 1998).

After we received briefs and heard arguments on this case, our superior court decided *United States v. Traum,* 60 M.J. 226 (C.A.A.F.2004), *cert. denied,* 543 U.S. 1055, 125 S.Ct. 920, 160 L.Ed.2d 779 (2005), a case that involved a challenge to testimony very similar to that offered in the case before us. Indeed, Dr. Cooper also served as an expert

witness in *Traum*. Our superior court held that expert testimony indicating a biological parent is "the most likely person to kill a child" was impermissible profile evidence. *Id.* at 233. The accused in *Traum* suffocated her 18–month–old child. She was home alone with the child at the time of the injuries, and the expert testimony could have only applied to her. In the case at hand, though, we have another parent as a potential suspect, and the testimony applied equally to both. Thus, on the facts before us, we conclude that admission of this testimony was an obvious or clear error, but otherwise harmless. *See Powell*, 49 M.J. at 225.

 As to Dr. Cooper's testimony that fatal child abuse is most common in infants under the age of 12 months, we find this to be permissible testimony about the "characteristics of a battered child." *See Traum*, 60 M.J. at 235. The same holds true for Dr. Cooper's testimony indicating that the most significant trigger for a baby-shaking event is persistent crying. Neither statement is impermissible profile evidence because of the focus on the child, rather than the parent. Consequently, we conclude this was not error, plain or otherwise.

 We next turn to the testimony concerning the behavioral factors used by medical professionals in reaching a diagnosis of non-accidental injury. Dr. Cooper testified that doctors look at three things to determine whether an injury was intentional or accidental: (1) The history given by the person seeking medical care for the child and anyone else who may have been in the environment; (2) The behavior of those caring for the child; and (3) The findings from the physical examination. Because the Harrises' testimony established that Mr. Jackson was very caring and that the appellant appeared less so, the appellant argues this testimony effectively took Mr. Jackson out of the profile.

Dr. Cooper's testimony about this three-factor analysis was much the same as her testimony in *Traum*. Our superior court concluded her testimony describing the analysis was proper because the record supported a conclusion that this methodology was relied upon by experts in the field of forensic pediatrics. *Id.* at 234–35. *See also* Mil. R. Evid. 702. The same holds true in the present case. Dr. Cooper's testimony was provided "in the context of her general description of fatal child abuse." *See Traum*, 60 M.J. at 234. Moreover, apart from Dr. Cooper describing this analysis as one that doctors consider for diagnostic purposes, we are unable to discern any attempt by the government to create a "profile" of a typical child abuser by linking the Harrises' testimony to her expert testimony. In any event, the Harris testimony was independently admissible.

### Uncharged Misconduct Involving Minor Parental Abuse

The appellant next argues the military judge erred in admitting uncharged misconduct evidence involving the testimony of three witnesses. *See* Mil. R. Evid. 404(b).

The first of these witnesses was Airman (Amn) Mills. She testified the appellant and Destiny were in her dormitory room a few weeks prior to 23 June 2000. The baby was approximately five months old at the time and teething. She bit her mother's hand, and the appellant then "grabbed her and told her that it hurt." According to Amn Mills, the appellant "kind of bit her hand back." Destiny cried, but the bite did not cause any bleeding or marks. Amn Mills also testified that when Destiny "would try to reach for something that she didn't need to be touching or [the appellant] didn't want her to have, she would kind of flick her hand, like a pluck on the hand, and tell her to stop."

The second witness to testify was Staff Sergeant (SSgt) Quick, who was at a restaurant with the appellant and Destiny when the child became restless and irritable. According to SSgt Quick, Destiny was "fussing and kicking and fighting because she didn't want to sit down. And [the appellant] thumped her on the thigh." She described it as a loud flick that caused everyone in the restaurant to turn and look. Destiny cried, and the appellant told her she "knew better."

Mrs. Harris testified about another incident, stating: "It was in the afternoon time. I was at [the appellant's] house, and she was trying to put her shoe on to go somewhere.

And Destiny would not hold her foot still to put her shoe on. [The appellant] ... jerked her by her arm real tightly and grabbed her face real tightly and squeezed her cheeks and called her stupid and ugly." The court members asked several questions about this, including whether it was just the one time, and Mrs. Harris indicated that it was only once. They also asked whether she saw other abusive behavior. The judge did not permit this question to be answered.

At trial, the appellant challenged this uncharged misconduct evidence in a motion in limine prior to the presentation of evidence.[6] In ruling on the motion, the military judge applied the following three-part test found in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A.1989), to determine admissibility under Mil. R. Evid. 404(b):

1. Does the evidence reasonably support a finding by the court members that the appellant committed the prior crimes, wrongs, or acts?

2. What fact of consequence is made more or less probable by the existence of this evidence? Mil. R. Evid. 401.

3. Is the probative value of the evidence substantially outweighed by the danger of unfair prejudice? Mil. R. Evid. 403.

The military judge found the evidence sufficiently reliable to support a finding that the appellant committed these acts. On appeal, the appellant does not challenge this portion of the ruling. The record readily establishes that prong 1 of the *Reynolds* analysis was met, and so we turn to prong 2.

■■■ Uncharged misconduct offered under Mil. R. Evid. 404(b) is not admissible if it "is offered simply to prove that an accused is a bad person." *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F.2002). *See also Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ("The threshold inquiry a court must make before admitting similar acts evidence under [Mil. R. Evid.] 404(b) is whether that evidence is probative of a material issue other

than character."). However, it is a "rule of inclusion, not exclusion." *Humpherys*, 57 M.J. at 90.

The military judge initially concluded the testimony of these three witnesses was admissible "to show a pattern of child abuse in the past and reflecting the intent of the accused for the acts alleged on 23 June 2000." He modified this in his final instructions to the court members, stating the evidence was admitted for the "limited purpose of its tendency, if any, to prove that the accused intended to murder or inflict great bodily harm upon Destiny Harrow, or to rebut the contention that the accused accidentally injured Destiny." On appeal, the government argues that the evidence is relevant to intent, that is, her "state of mind" on 23 June 2000, but does not rely on absence of an accident as instructed by the military judge.

■■■ When uncharged misconduct evidence is offered to prove intent, "the relevancy of the other crime is derived from the accused's possession of the same state of mind in the commission of both [offenses]." *United States v. Rappaport*, 22 M.J. 445, 447 (C.M.A.1986). The state of mind does not have to be identical, but must be "sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offenses." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F.2004). The link between the charged and uncharged misconduct must "permit meaningful comparison." *Id.*

The flicking, thumping, and biting incidents reflect a state of mind indicating the appellant responded to Destiny's irritating, yet normal, behavior with deliberate, inappropriate physical force. We find these incidents are highly similar to Mr. Jackson's description of the appellant grabbing Destiny off of the couch on the morning she was injured. He said the appellant held Destiny by one arm and jerked her around. In response to Mr. Jackson's plea to not take her anger out on Destiny, she replied, "I do what

---

6. The trial defense counsel appropriately challenged this evidence in a motion in limine. However, we note that military judges should exercise caution in ruling on the admissibility of uncharged misconduct evidence prior to the presentation of evidence and before its materiality is clearly established.

I want with my baby." When viewed in the context of all of the facts and circumstances surrounding the appellant's state of mind on 23 June 2000, we are convinced that the intent behind the uncharged acts of misconduct was "sufficiently similar" to the charged offense to meet the second *Reynolds* prong.

Nonetheless, the appellant further argues that intent was not "in issue" and the challenged evidence should not have been admitted. Her strategy at trial was to develop and highlight any evidence that suggested Mr. Jackson was the one who injured Destiny. Although the defense did not concede the issue of intent or suggest that the members should consider one of the lesser-included offenses, they clearly focused on their theory that the evidence could not rule out Mr. Jackson as the perpetrator.

 We find no merit to this argument. A decision not to contest the issue of intent did not make otherwise proper evidence of uncharged misconduct relating to intent inadmissible. *United States v. Sweeney*, 48 M.J. 117, 120 (C.A.A.F.1998) (clarifying *United States v. Franklin*, 35 M.J. 311, 317 (C.M.A.1992)). *See also Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("the prosecution's burden to prove every element of the crime beyond a reasonable doubt is not relieved by a defendant's tactical decision not to contest an essential element of the offense"). *But cf. United States v. Diaz*, 59 M.J. 79, 95 (C.A.A.F.2003) (holding uncharged misconduct was not properly admitted to rebut an affirmative defense that was not raised); *United States v. Morrison*, 52 M.J. 117 (C.A.A.F.1999) (holding it was error to admit uncharged misconduct where motive and intent were clearly not at issue).

 Having concluded prong 2 of the *Reynolds* analysis is satisfied, we turn to the third prong and conclude it also has been met. The probative value of the testimony of the three witnesses outweighed its prejudicial impact. We note that the uncharged acts of misconduct were close in time to the charged offense and involved the same victim. Additionally, the conduct is not so shocking as to have a dramatic prejudicial impact. The military judge did not abuse his discretion in admitting this evidence.

 Before leaving this issue, however, we note that, generally speaking, Mil. R. Evid. 404(b) is interpreted more restrictively in military jurisprudence than its counterpart in other federal courts. In applying this jurisprudence, it is clear that military decisions are very fact specific, often based upon the totality of the circumstances, rather than granting the military judge broad discretion. *See, e.g., United States v. Hays*, 62 M.J. 158 (C.A.A.F.2005); *United States v. Bresnahan*, 62 M.J. 137 (C.A.A.F.2005); *United States v. Rhodes*, 61 M.J. 445 (C.A.A.F.2005); *Diaz*, 59 M.J. at 79. Given this lack of predictability, we will continue our analysis by reviewing for harmless error. We test for harmlessness by determining:

> [W]hether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. As we apply this standard, the defense must initially meet the threshold burden of showing that an error has occurred which is of such a character that its natural effect is to prejudice litigant's substantial rights. The burden then shifts to the Government to persuade us that the error was harmless.

*Rhodes*, 61 M.J. at 453 (internal quotations omitted).

There was little risk the members improperly used this evidence to conclude the appellant was a bad person and thus was more likely to have murdered Destiny. Although the court members asked a lot of questions about abusive behavior, the judge did not allow most of them, and he repeatedly admonished them that there was no evidence before them of other maltreatment or injury to Destiny. The military judge's instructions clearly told them that they could not use this evidence in that manner.

Moreover, as discussed previously, the government's case was exceptionally strong. The cause of Destiny's death and the date she was injured were not at issue. Intent—the reason this evidence was admitted—although not conceded, was not seriously challenged. During argument on findings, nei-

ther side addressed this evidence either specifically or generically. Thus, the overall effect of this uncharged misconduct was not that significant.

The primary focus at trial was on who did it—the appellant or Mr. Jackson. The testimony of Mr. and Mrs. Harris and Mr. Jackson clearly established that the appellant was in an uncontrolled rage at the time the injuries would have occurred. The testimony of SrA Warren, that the appellant seemed in control of herself when he talked to her in the doorway, does not seriously discredit that testimony.

Additionally, the appellant admitted that at the time she departed the apartment, Mr. Jackson was in the bathroom and Destiny was on the couch, not crying. These admissions significantly damaged the appellant's theory of the case—that Mr. Jackson had sufficient time and motive to inflict the head injuries on Destiny after her departure. Given the two to three-minute period between the time the appellant left her apartment and when the 911 call was placed, it is unlikely Mr. Jackson would have had time to come out of the bathroom, observe the appellant depart in her car, shake Destiny, and then carry her to the Harris' apartment. Moreover, medical testimony indicated it was unlikely Destiny would have entered into a tonic seizure in such a short timeframe.

The government's evidence also clearly established the appellant's motive to kill or cause grievous bodily harm to Destiny. Witnesses detailed her increasing resentment of Destiny and how her birth had affected her financial and social situation and her relationship with Mr. Jackson.

The appellant also made several admissions or statements reflecting consciousness of guilt. She lied to several people who asked her how the injuries occurred by making clearly false statements that pointed the blame at Mr. Jackson. She also told investigators she was not going to stress over the investigation until they had proof. Additionally, she told several different stories about where she went after she departed the apartment, and lied to investigators when she denied having an argument at the apartment or that she was angry or frustrated when she left.

Finally, the appellant admitted she may have caused the injuries to Destiny by throwing her in the air in a playful manner or possibly when she quickly turned away from the door after SrA Warren departed. She agreed with investigators that either she or Mr. Jackson had to have caused Destiny's injuries, but ultimately told them she did not believe Mr. Jackson did it.

Applying the standard enunciated in *Rhodes*, 61 M.J. at 453, in conjunction with the long-standing four-part analysis established in *Kerr*, 51 M.J. at 405, we can say with "fair assurance" that the judgment was not substantially swayed by any error in admitting the testimony of the three witnesses.

### Providency of Pleas

▮ Next the appellant challenges the providency of her guilty pleas to three specifications. We address only one: Whether her discussion with the military judge about a four-day absence without leave offense (terminated by apprehension) established a substantial basis for questioning the appellant's guilty plea. We conclude that it did.

Several months after Destiny's death, the appellant was on authorized leave. On the day she was to return from leave, her parents took her to a civilian mental health center. She stayed there for several days. She told the military judge, "I consented to be admitted, and when I was checked in I told them I was in the military. I asked them to call and tell my unit where I was. A couple of hours later, the [Air Force Office of Special Investigations] came and picked me up." The military judge asked her why she wanted hospital officials to notify military authorities. She told the judge she had seen medical providers there before and "was just letting them know where I lived at and that I was in the military." The judge then asked, "Did you disclose this to them because of your desire to return to military control?" She responded, "Yes, sir." Additionally, she said, "I told them to call, sir, to let my unit know where I was, but I didn't plan on coming back [to the base]. I planned to stay at the hospital."

A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion. *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F.1996). "Pleas of guilty should not be set aside on appeal unless there is 'a "substantial basis" in law and fact for questioning the guilty plea.' " *Id.* at 375 (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A.1991)).

Article 86, UCMJ, 10 U.S.C. § 886, is "designed to cover every case not elsewhere provided for in which any member of the armed forces is *through the member's own fault* not at the place where the member is required to be at the prescribed time." *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 10c(1) (2005 ed.)[7] (emphasis added). The record reveals a "substantial conflict" as to whether the appellant's mental health status precluded her ability to report to her place of duty in a timely fashion. We hold the military judge abused his discretion in accepting the appellant's plea to this offense. We dismiss this specification and next turn to whether we can reassess the sentence.

We conclude we can reliably determine what sentence the court members would have imposed if the error had not occurred. *See United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). After careful consideration of the entire record, as well as the maximum allowable punishment for a violation of Article 86, UCMJ, we are confident the court members would have adjudged a sentence of no less than a dishonorable discharge, confinement for 24 years and 6 months, forfeiture of all pay and allowances, and reduction to the grade of E–1.

*Conclusion*

Specification 2 of Additional Charge I is set aside and dismissed. The amended findings and the reassessed sentence are correct in law and fact and no error prejudicial to the substantial rights of the appellant occurred. Article 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings, as amended, and the sentence, as reassessed, are

AFFIRMED.

Judge GENT participated in this opinion prior to her retirement.

---

**7.** This provision is the same in the 2000 edition of the *Manual*, which was in effect at the time of trial.