*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, STEPHENS, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Austin J. HANABARGER**
Corporal (E-4), U.S. Marine Corps
Appellant

**No. 201900031**

Decided: 30 July 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
John L. Ferriter (motions)
Jeffrey V. Munoz (arraignment, motions, trial)

Sentence adjudged 13 September 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to pay grade E-1, confinement for four years, forfeiture of all pay and allowances, and a dishonorable discharge.

For Appellant:
*Mr. Nathan Freeburg, Esq.*
*Lieutenant Michael W. Wester, JAGC, USN*

For Appellee:
*Lieutenant Kimberly Rios, JAGC, USN*
*Lieutenant Joshua C. Fiveson, JAGC, USN*

Senior Judge STEPHENS delivered the opinion of the Court, in which Judge STEWART joined. Senior Judge GASTON filed a separate opinion, dissenting.

—————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

—————————————

STEPHENS, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice [UCMJ],[1] for penetrating Staff Sergeant (E-6) [SSgt] Charlie's[2] vulva with his penis by causing bodily harm (i.e., as charged, doing so without her consent) and then doing so again several hours later when he knew or reasonably should have known she was asleep.[3]

He asserts four assignments of error [AOEs], which we reorder as follows: (1) the evidence is legally and factually insufficient to support Appellant's convictions; (2) the trial counsel committed prosecutorial misconduct by introducing evidence of bruising to SSgt Charlie's inner thighs at trial after unequivocally promising during pretrial litigation that he would not do so; (3) the military judge erred in denying a Defense motion to compel production of the lead Naval Criminal Investigative Service [NCIS] agent who investigated the case; and (4) Appellant's trial defense counsel were constitutionally ineffective. Because we find the convictions factually insufficient, we do not reach the other AOEs. Accordingly, we set aside the findings and sentence and dismiss with prejudice.

—————————————

[1] 10 U.S.C. § 920 (2012).

[2] For readability and privacy interests, we have replaced all names with pseudonyms.

[3] Appellant was acquitted of penetrating SSgt Charlie's vulva with his penis when he knew or reasonably should have known that she was unaware the sexual act was occurring due to her exhaustion and intoxication.

## I. BACKGROUND

### A. The Evening Prior to the Alleged Assault

On a Friday evening, SSgt Charlie and three female civilian friends had dinner together at a Mexican restaurant in Temecula, California, and then proceeded to a nearby country bar. This was SSgt Charlie's first night out to drink and socialize in the preceding 13 months since giving birth. Since then, she had only occasionally had a glass of wine with dinner and did not drink at all when she was pregnant. Once at the bar, they met up with three junior Marines, whom SSgt Charlie knew from work. One was Appellant. The other two were Sergeant (E-5) [Sgt] Romeo, a male, and Corporal (E-4) [Cpl] Alpha, a female. SSgt Charlie drank alcohol and became increasingly intoxicated over the course of several hours. She had four mixed drinks at the restaurant and continued to drink an unknown quantity of alcohol at the bar, where she danced with her female friends and at one point attempted to ride a mechanical bull. By the time the bar closed at 0200, she was noticeably intoxicated and others in the group were helping her walk.

During this time, SSgt Charlie was not flirting or otherwise engaging one-on-one with Appellant, who was a designated driver and remained sober. Prior to that night, SSgt Charlie and Appellant had never been romantically or intimately involved. Several months before, Appellant had asked her out on a few occasions, but she had not reciprocated his interest and had repeatedly turned him down.

When the group left, SSgt Charlie suggested they all go to her nearby apartment complex, where she initially led them into the wrong apartment. After the group managed to get into her apartment, SSgt Charlie laughed and rolled around on the floor. Her civilian friends left the apartment around 0300, by which time, to at least one of her friends, SSgt Charlie appeared to be sobering up and was more coherent as she did not drink any more alcohol since leaving the bar. SSgt Charlie never vomited or passed out that night.

At Appellant's suggestion, the three junior Marines spent the night at SSgt Charlie's apartment. While the other two junior Marines went to sleep on the couch in the living room, Appellant went and sat on SSgt Charlie's bed. Sometime after 0400, she came into her bedroom, removed her contact lenses, and went to bed. Based on her last memory, she was wearing underwear, tight leggings similar to yoga pants, and a tank top shirt that had a built-in bra. She then went to her bed, where Appellant already was situated.

**B. The Morning After the Alleged Assault**

The next morning, sometime around 0900, there was a knock on SSgt Charlie's closed bedroom door. It was Cpl Alpha who called out, "Are you decent?"[4] Appellant replied, "No. Definitely not,"[5] and then SSgt Charlie appeared at the door in a bathrobe. Cpl Alpha described the time between her knock and SSgt Charlie appearing at the door as "pretty fast."[6] She assumed she "ran"[7] to the door. She asked SSgt Charlie for a hair brush, which she went and got for her. When Cpl Alpha was inside the bedroom, she saw Appellant covering his nudity with one of SSgt Charlie's pillows.

Although she did not expect to see Appellant naked on SSgt Charlie's bed, nothing appeared out of the ordinary to Cpl Alpha. SSgt Charlie did not make any exclamations or act in any way that caused Cpl Alpha concern. SSgt Charlie would later testify that she was awakened by the combination of Cpl Alpha's knock on the door and Appellant "aggressively"[8] thrusting his penis in her vagina as she was naked from the waist down. She also later testified that her last memory of the evening was at the bar they went to after dinner.

Cpl Alpha took the hairbrush and went into a bathroom for several minutes. When she returned to the living room, she saw SSgt Charlie emerge from her bedroom and then, sometime after, Appellant. For about another hour or so, the junior Marines stayed at the apartment. A hungover SSgt Charlie asked questions about what had occurred the prior evening. She later testified she felt uncomfortable that morning. She also appeared, to Cpl Alpha, to be keeping her distance from Appellant. She did laugh at certain points during the conversation about various things that happened at the bar; for example, having no memory of riding the mechanical bull. Before leaving, Cpl Alpha saw SSgt Charlie grab her sheets from her bedroom and place them in her washing machine. As the other two junior Marines walked out the door, Appellant grabbed SSgt Charlie by the waist and tried to give her a kiss goodbye, but she shrugged him off and turned away. Appellant lingered at the apartment and joined Sgt Romeo and Cpl Alpha at the car about two minutes later.

---

[4] R. at 475.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.* at 255.

On the ride back to Camp Pendleton, Appellant, according to Cpl Alpha and Sgt Romeo, was "elated."[9] He spoked excitedly about his evening with SSgt Charlie about a "couple different" sexual encounters.[10] He bragged that SSgt Charlie had instigated the encounters and discussed her method of climax in vulgar and salacious terms that would be embarrassing to SSgt Charlie. Appellant drove the conversation and seemed excited that he had finally been able to get SSgt Charlie to want to be in a relationship with him.

Back at her apartment, SSgt Charlie noticed she had bruising on her inner thighs, scrapes on her arms, and pain in her "lower half," but no memory of where the injuries came from.

## C. Unrestricted Report of Sexual Assault

### 1. Cpl Alpha and SSgt Charlie's in-person conversation and text messages

Beginning with the ride back to Camp Pendleton, and over the next few days, SSgt Charlie exchanged text messages with Cpl Alpha. Among other things, Cpl Alpha told her that Appellant had bragged on the return trip about the way she climaxed and that they had sex a "couple different" times.[11]

Cpl Alpha also spoke with SSgt Charlie at work the following Monday. When she testified, Cpl Alpha described SSgt Charlie as now "really upset"[12] though she never specifically alleged she had been sexually assaulted. When trial counsel asked Cpl Alpha if SSgt Charlie's demeanor was because she "was regretting what happened [with Appellant], or was there more to it?" she answered, "It seemed like there was more to it. I think she also regret it [*sic*]—that it even happened in the first place."[13] Cpl Alpha recalled getting very upset and telling SSgt Charlie she should "go to the hospital."[14]

On cross-examination, Cpl Alpha recalled that in her text messages with SSgt Charlie, the day after they went out and the next day, there were no allegations of sexual assault. When Cpl Alpha was confronted with her prior statement to

---

[9] *Id.* at 479.

[10] *Id.*

[11] *Id.*

[12] *Id.* at 487.

[13] *Id.*

[14] *Id.* at 488.

NCIS, she acknowledged that her memory of those text messages was, "She said she didn't want it but it wasn't like, a rape allegation. It was just that she was like, 'Crap.'"[15] Those text messages were not available for trial because Cpl Alpha deleted them. She testified that NCIS Special Agent [SA] Sierra, the lead agent on the case, told her she only needed to keep the text messages from Appellant. SA LS also did not testify, because the military judge denied the defense motion to have her produced at trial.

### 2. Cpl Alpha's text messages with Appellant

Over the next few days, Cpl Alpha texted with Appellant. They discussed their respective romantic interest in SSgt Charlie and Sgt Romeo. Appellant repeatedly mentioned how he was in love with SSgt Charlie, how amazing and beautiful she was, and how he was on a "permanent high" because she was his "dream girl."[16] He described how he was sending her long text messages declaring his feelings for SSgt Charlie. He also repeatedly inquired if Cpl Alpha had spoken to SSgt Charlie to see if she was interested in him. Cpl Alpha repeatedly told him SSgt Charlie was "not looking for a relationship right [now]."[17] Appellant sent Cpl Alpha a screen cap [saved image of a phone's screen] of some of the text messages and digital pictures he had sent to SSgt Charlie. One attached picture appeared to be a piece of notebook paper with flowery-looking handwriting that read, "God has a purpose for your pain, a reason for your struggle, and a reward for your faithfulness. Trust Him . . . ."[18] This appeared to be in reference to Appellant seeing SSgt Charlie as "someone that has [so] much to offer" be "treated like s[***] and used!"[19] He apologized to her for "being sprung" while she had "[a] lot going on."[20] Cpl Alpha acknowledged to Appellant that SSgt Charlie was "going through a lot of s[***]."[21] Appellant also sent Cpl Alpha a screen cap of the receipt for some flowers he sent to SSgt Charlie on the Monday after the night out.

---

[15] *Id.* at 509.

[16] Pros. Ex. 6.

[17] *Id.* at 8, 13, 15.

[18] *Id.* at 11.

[19] *Id.* at 10.

[20] *Id.*

[21] *Id.* at 11.

Appellant also described how he felt when he left SSgt Charlie's apartment when she "kissed me that morning" and how his "world turned upside down."[22] Appellant eventually seemed to acknowledge SSgt Charlie's lack of interest as he lamented that he would have treated her "like a queen if ever given the chance"[23] and that he was not going to hurt her like all those "dbag guys."[24]

Eventually Appellant complained to Cpl Alpha that SSgt Charlie was screen-shotting his text messages, but not replying. "Send[ing] her flowers makes me seem stalkerish I guess Idk I don't wanna talk about it I f[***]ed up im not her type and I just gotta realize that."[25]

During all the text messages, both Appellant and Cpl Alpha referred to SSgt Charlie only by her first name.

### 3. SSgt Charlie's text messages with Appellant

About an hour after Appellant left SSgt Charlie's apartment, he began texting her. He told her things like, "I'm on a high right now. Last night was great. You're amazing. You deserve nothing but respect."[26] SSgt Charlie never confronted him about any of the allegations, but only inquired whether he ejaculated in her.

Though most all of the texts were deleted, SSgt Charlie described them as "an array of messages, like paragraphs about how he fell for me and has been out of the game and maybe came on too strong, and that he looks up to me."[27] She only initially responded to Appellant to find out what happened and was concerned that his comments to her contradicted what she heard, per Cpl Alpha, about what Appellant said on the ride back to Camp Pendleton. For example, Appellant told SSgt Charlie that he did not ejaculate, which was different from what he told Cpl Alpha and Sgt Romeo.

On the following Monday, Appellant sent SSgt Charlie some flowers. The florist called her at work to tell her he was attempting to deliver some flowers to her and he would leave them in a shady spot. SSgt Charlie later learned the flowers were

---

[22] *Id.* at 13.

[23] *Id.*

[24] *Id.* at 16.

[25] *Id.* at 23.

[26] R. at 297.

[27] *Id.* at 264.

from Appellant, who followed up with some text messages about them. She threw the flowers in a dumpster.

After Appellant sent the flowers, he texted her again. He wrote, "Hope you had [a] great day today Hun" and "I apologize for the flower[s] I knew you were having a hard time and was hoping it would bring light on some of the darker days! I know I over stepped my boundaries and I'm sorry! It won't happen again."[28] When she did not respond, Appellant texted the next morning, "Sorry about everything! Let me know if you ever need to talk or need help with anything!"[29] Two hours later, apparently realizing she was "screen-shotting" his text messages, he again texted:

> Can you at least tell me to f[***] off or something? Cause screen [shotting] me apologizing to you and trying to make amends and being met with deaf ears is kinda messed up! Even a simple hey I understand I just got a lot going on thank you for the gesture or something! But not a single word! I don't know what I did to p[***] you off but I am truly sorry I just hate being ignored by someone I look up to is all! So once again best of luck to you I hope it all works out in your favor and you ever need anything you have my number! Take care!![30]

Appellant also contacted SSgt Charlie on a different social media application, sending her long paragraphs about his feelings for her, "coming on too strong," and generally praising her. She was able to save at least one of them.[31] SSgt Charlie had no further interaction with Appellant until she went to NCIS.

*4. SSgt Charlie's civilian friend encourages her to report a sexual assault*

On Monday, two days after the incident, after 1600, SSgt Charlie text messaged a civilian friend, Ms. Victor. She was a former Marine and had known SSgt Charlie for several years since meeting on a deployment. She described SSgt Charlie as "one of her closest friends" and "like a sister."[32] On direct, she testified that when SSgt Charlie told her she had been sexually assaulted, she went to the hospital with her. She stayed with her while she underwent a Sexual Assault Forensic Examination (SAFE).

---

[28] Pros. Ex. 3 at 2.

[29] *Id.*

[30] *Id.* at 3.

[31] Pros. Ex. 4.

[32] R. at 542.

On cross-examination, Ms. Victor testified about the substance of their text messages. SSgt Charlie texted her, "So I blacked out drunk Friday, while the DD [designated driver] who was totally sober took advantage and I just feel dirty," to which Ms. Victor asked, "What do you mean? Like rape? Who is he? DD was friends with those teachers [the civilians], right?" SSgt Charlie answered, "I mean, *by definition*, absolutely. He's . . . asked me out like 2,468 times, but he is not my type. Not attractive. Just gross."[33]

Ms. Victor then encouraged SSgt Charlie to file a sexual assault report. At some point later, SSgt Charlie told her Cpl Alpha had recommended she just "sit on" what happened and "just think" before reporting.[34] Ms. Victor's response to Cpl Alpha's advice was, "F[***] her dumb b[***] a[***] for f[***]in' sayin' that s[***]."[35] Ms. Victor also encouraged SSgt Charlie to retain text messages from Appellant for NCIS, such as the one where he apologized for sending flowers. "Keep that. He's f[***]ed."[36]

Ms. Victor also told SSgt Charlie that she did remember once meeting Appellant. She recalled him as "the creepy looking guy" and told her friend that "No woman in their right mind or their intoxicated mind would want that nasty f[***]'s penis inside of them unless they too were completely f[***]ing retarded."[37]

At trial, she concluded her cross-examination by denying she "hated" Appellant, despite texting SSgt Charlie, "God, I hate that mother[***]."[38] She explained that she was "heated" when she wrote that. Then on re-direct she confirmed she still hated Appellant because he "sexually assaulted my friend who is like a sister to me."[39]

---

[33] *Id.* at 550 (emphasis added).

[34] *Id.* at 555.

[35] *Id.*

[36] *Id.* at 557.

[37] *Id.* at 562.

[38] *Id.* at 563.

[39] *Id.* at 564. We consider Ms. Victor's acknowledgement of the substance of her text messages to and from SSgt Charlie just as the members did, not as substantive evidence, but as reflecting on her motivations for her testimony and her role in supporting and encouraging SSgt Charlie to report this as a sexual assault. We are especially mindful in conducting a factual sufficiency review, we are "limited to the evidence presented at trial." *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007).

*5. SSgt Charlie reports a sexual assault to NCIS*

With the support and encouragement of Ms. Victor, on the Tuesday after the incident, SSgt Charlie went to the hospital for a SAFE and made a report to her command.

During the SAFE, SSgt Charlie told the forensic examiner what happened. The examiner testified that SSgt Charlie told her of the night out and the drinking and her inability to recall anything until the next morning. The examiner further described what she recalled SSgt Charlie had told her, "[h]e was spooning her with his arm across her chest, her tank top pulled down, and that he was vaginally penetrating her with his penis and that she rolled . . . off the bed and got up and put on a robe."[40] The examiner did not testify about the incident being interrupted by a knock.

The forensic examiner also obtained vaginal swabs for DNA testing. The testing ultimately revealed the presence of Appellant's DNA, but no semen, and additional information that was the subject of a Defense motion under Military Rule of Evidence 412.

SSgt Charlie eventually made her report unrestricted and on the subsequent Monday—nine days after the morning in question—she was interviewed by SA LS, NCIS.[41] During the interview, with SA LS's help, SSgt Charlie engaged in monitored text messaging with Appellant. Before it began, she advised SSgt Charlie:

> Ultimately what you want—or what we're looking for is that he knew you were blackout drunk, you did not want to have sex with him. *And as being blackout drunk, you cannot consent. Like, have you skipped out on every sexual assault—have you not been present for any sexual assault brief?* Like I was so drunk, I can't consent. I don't want your flowers, I don't want anything from you, I just—maybe an apology.
>
> . . . .

---

[40] *Id*. at 573.

[41] Though not in front of the members, it appears SSgt Charlie also reported this to civilian law enforcement, but then NCIS assumed jurisdiction over the case. SSgt Charlie texted Ms. Victor that the "special agent" she spoke with at NCIS informed her that it would take the case and the special agent also said it "was a blessing in disguise because NCIS don't f[***] around." *See* App. Ex. LIV at 45.

> I mean, you could just say something even as simple as like, *have you not sat through the briefings where they talk about this like, every year? Because Marines are mandated to do that class, they are mandated to go to that training, and they are well aware that if someone's intoxicated, they cannot consent.*[42]

Armed with this inaccurate legal advice from the lead NCIS agent on the case, SSgt Charlie confronted Appellant about having sex with her when she was "blackout drunk."[43] SSgt Charlie opened with, "Hey sorry I've been MIA . . . are you busy right now" and there was some introductory small talk. Then their conversation went:

| | |
|---|---|
| SSgt Charlie: | Dude . . . what happened last weekend? I seriously don't remember leaving the bar? |
| Appellant: | O Jeez. Is that why you have been ghosting? |
| SSgt Charlie: | Haha yeah . . . wtf happened |
| Appellant: | So did you get the flowers then |
| | Those were to just show you better things [are to] come |
| SSgt Charlie: | Yeah, I got the flowers lol, wasn't sure why I got them |
| Appellant: | We were talking bout how s[***]y things have been so I sent you flowers to brighten things up and show you better days are sure to come |
| SSgt Charlie: | Lol what s[***]y days |
| Appellant: | You said you were having a rough time with something [but] didn't wanna talk about it lol |
| SSgt Charlie: | I'm gonna just be blunt about this . . . the reason I ghosted you is because you knew we were just friends, you knew I wasn't interested in you like that dude. I was blackout drunk and woke up with you in my bed . . . sober. |
| Appellant: | Ok so I was fully clothed laying down you came onto me and I stopped you at first |

---

[42] Appellate Exhibit [App. Ex.] XII at 62-63 (emphasis added).

[43] R. at 282.

|  | The[n] you crawled in bed next to me covered me up grab my arm and put it around you and I asked are you sure |
|---|---|
| SSgt Charlie: | Why were you in my bed though |
| Appellant: | I asked if I could lay down cause I had a migraine |
|  | And [Sgt Romeo] and [Cpl Alpha] were on the couch |
|  | Can I just call you |
| SSgt Charlie: | I can't talk on the phone I'm in the vault |
|  | And I don't want to talk about this in front of [redacted] |
| Appellant: | Yea I get that Hun |
| SSgt Charlie: | I just want you to acknowledge that I was legitimately blackout drunk . . . you were stone cold sober. How in your mind was that ok. |
| Appellant: | And honestly I didn't want to have sex with you cause I knew you didn't but you kept coming onto me |
|  | And coming on to me |
| SSgt Charlie: | It's just really been bothering me, I really don't think we should talk anymore. Good luck with everything[44] |

At that point, SA LS chimed in, "Okay, yeah, that's enough. We don't need to talk to him anymore."[45] But Appellant did not know the conversation was over. He continued texting SSgt Charlie, "It's been bothering me to[o] cause I knew this was going to happen even tho you kept coming on to me you made the first move not me you can ask [Cpl Alpha] and [Sgt Romeo] I stayed away from you all night."[46]

During the rest of the investigation, SA LS oversaw the data extraction from SSgt Charlie's phone. SSgt Charlie later maintained that she was told by NCIS that she could then delete relevant text messages she sent to various people following the incident. And she did. But the data extraction failed, as did subsequent attempts. The text messages were gone.

---

[44] Pros. Ex. 3 at 5-11.

[45] App. Ex. XXVII at 64.

[46] Pros. Ex. 3 at 11.

Four days after SSgt Charlie's unrestricted report to NCIS, Appellant was placed in pretrial confinement. SA LS was able to be present for the Initial Review Officer hearing. She characterized Appellant's conduct as "predatory" and proffered that the bruising found on SSgt Charlie's thighs was caused by Appellant.[47]

## D. General Court-Martial

### 1. Article 32, UCMJ, Preliminary Hearing Officer found no probable cause

A preliminary hearing was held pursuant to Article 32, UCMJ. A Major, who was an experienced judge advocate,[48] was appointed as the Preliminary Hearing Officer [PHO]. During the hearing, he reviewed NCIS interview reports of all the relevant witnesses and the SAFE report, and heard telephonic testimony of Sgt Romeo from Okinawa, Japan, and in-person testimony from Cpl Alpha. In his eight-page written report, he concluded the evidence did not establish probable cause that SSgt Charlie was sexually assaulted. Instead, he recommended both Appellant and SSgt Charlie be offered nonjudicial punishment for fraternization. He found that SSgt Charlie did not approach the legal definition of "substantial impairment" from her intoxication, and that Appellant's bragging about their sexual activity was the impetus for her report to "avoid legal jeopardy by declaring herself a sexual assault victim."[49]

The Deputy Staff Judge Advocate received the report and prepared a pre-trial advice letter for the convening authority pursuant to Article 34, UCMJ. The PHO's Report was listed as an enclosure, but in the Record of Trial the enclosures to the Article 34 letter only included the PHO Appointing Letter and some of the evidence.[50] The actual Article 34 advice letter makes no mention or reference whatsoever of the PHO's recommendations and opinion that the specifications lacked probable cause. On the face of the Article 34 letter, the convening authority would have no idea what the PHO recommended. And according to this Record of Trial, the

---

[47] Ap. Ex. III at 9.

[48] The Preliminary Hearing Officer was a prior enlisted Marine in the Reserves and had been a judge advocate for approximately 13 years, with fairly significant military justice experience as both a trial counsel and defense counsel. App. Ex. XI at 10.

[49] App. Ex. IX at 20.

[50] The full PHO's report is included in the Record of Trial, but only as an enclosure to App. Ex. III, App. Ex. IX, and App. Ex. XXV. These are all Defense Motions for, respectively, Release from Pretrial Confinement, to Preclude use of Government Evidence Under Military Rule of Evidence 404(b), and Abatement.

convening authority did not receive the PHO's Report as an enclosure. But the charges were referred to general court-martial.[51]

Prior to trial, the Defense moved for Appellant's release from pretrial confinement, largely due to the incongruence between the pretrial confinement Initial Review Officer's finding by a preponderance of the evidence that a crime was committed juxtaposed with the PHO's finding—considering a greater quantity of mostly Government evidence—that the evidence was insufficient to meet the lower threshold of probable cause. Though the Government filed a written opposition, it was never argued before the military judge. Appellant was released from pretrial confinement after 63 days.[52]

### 2. Pretrial litigation concerning SSgt Charlie's bruising

The parties litigated the circumstances of SSgt Charlie's bruises on her thighs. Appellant sought an expert on bruising and also moved under Military Rule of Evidence 412 to be able to present evidence and argue there was a different source of the bruising. In response to the Defense motion, the trial counsel, Captain JC, agreed to not introduce evidence or testimony of SSgt Charlie's bruising. Relying on the Government's promise, the Defense agreed to withdraw its motion for an expert and its motion to argue an alternate source of the bruising.

### 3. Trial, findings, and sentence

Despite the Government's earlier promise, when SSgt Charlie testified on direct examination, something very different happened.

> Q:     [SSgt Charlie], these days following the [date of the
>         incident], were you in any kind of physical pain?
>
> A:     Yes, sir.
>
> Q:     What kind of pain were you experiencing?
>
> A:     My inner thighs were bruised, and I just had pain in my
>         lower half.[53]

---

[51] This Court found another alcohol-facilitated sexual assault factually insufficient after the preliminary hearing officer's recommendation that the specifications lacked probable cause. *United States v. Lewis*, No. 201900049, 2020 CCA LEXIS 199 (N-M. Ct. Crim. App. June 8, 2020) (Stephens, S.J., concurring) (unpub. op.).

[52] R. at 11.

[53] *Id.* at 269-70.

The Defense immediately objected, argued the trial counsel was acting contrary to his earlier promise on behalf of the Government, and requested an Article 39(a) session.

During the Article 39(a), Captain JC, despite his agreement to not introduce evidence of the bruising, argued that the agreement somehow allowed the Government to use the bruising to prove SSgt Charlie's "impairment" at the time of the assaults. The Defense requested the military judge affirmatively instruct the members that Appellant was not the source of the bruising. The military judge, who was aware that Captain JC made the pretrial promise upon which the defense relied, let the evidence stand, instructing the members only that the evidence was admitted for the limited purpose of showing SSgt Charlie's intoxication. As for who caused the injuries, he instructed the members that they may not consider it for the purpose of deciding that Appellant caused them, explaining because "you do not have that information in front of you."[54]

SSgt Charlie testified that Appellant had bragged to her face, while in the apartment, about the vulgar and salacious detail from their sexual encounter, and did so in front of the two junior Marines. She testified that he said he "felt accomplished because"[55] of that detail and that he "actually said that right in front of [Cpl Alpha] and [Sgt Romeo]."[56] But neither Cpl Alpha nor Sgt Romeo recalled that and said they only heard that detail for the first time during the drive back to Camp Pendleton. SSgt Charlie testified that in response to hearing this detail, she "immediately" went to her bedroom, "tore [her] sheets off the bed," and put them in the washing machine.[57] But Cpl Alpha testified that after she brushed her hair, she saw SSgt Charlie emerge from her room and place her sheets in the washing machine. SSgt Charlie also characterized the junior Marines staying for only about "20 minutes"[58] that morning as she testified that she told them they needed to "start getting their stuff to go"[59] because her son was getting dropped off shortly. But Cpl Alpha estimated they stayed at SSgt Charlie's apartment for "between 30 minutes to an hour"[60] and also estimated that she woke up around 0900 or 0930,

---

[54] *Id.* at 277-78.

[55] *Id.* at 258.

[56] *Id.* at 298.

[57] *Id.* at 258.

[58] *Id.* at 261.

[59] *Id.* at 257.

[60] *Id.* at 478.

went to knock on SSgt Charlie's door, and ended up staying until approximately 1100.

At trial, the Government's theory was that Appellant had planned to meet up with SSgt Charlie because he knew she was drinking alcohol that night. The Government portrayed Appellant as staying sober and silently watching her become more and more intoxicated. After managing to get himself to her apartment he argued for them all staying put—the other two were intoxicated—instead of driving back to Camp Pendleton. Appellant then disappeared and lay in SSgt Charlie's bed waiting for her to arrive. Sometime around 0430, while she was incapable of consenting due to intoxication and exhaustion, he penetrated her vagina with his penis. Then, sometime around 0900, he again penetrated her vagina with his penis while she was asleep. To cover this up, according to the Government, he embellished what happened with Cpl Alpha and Sgt Romeo, describing a false narrative of consensual sexual encounters that signaled a long-hoped-for and now-budding romantic relationship. When he was confronted in the controlled text messaging conversation, he went into "damage control" and, for the first time, falsely claimed that he went to SSgt Charlie's bed (after asking her if he could do so) because he had a migraine headache.

In addition to the witnesses described above, the Government presented evidence that Appellant's DNA was found on the vaginal swab obtained during SSgt Charlie's SAFE, but that no semen or sperm cells were found, which could have been consistent with someone who had intercourse but did not ejaculate. The SAFE was conducted on the Tuesday after the incident, just outside the "72 hour or three day mark"[61] where, according to the Government's DNA expert, detection becomes more difficult.

The members acquitted Appellant of sexually assaulting SSgt Charlie when she was unaware due to her "exhaustion and intoxication," but found him guilty of sexually assaulting her under a bodily harm theory (the 0430 assault) and while asleep (the 0900 assault).

---

[61] *Id.* at 599.

## II. DISCUSSION

### A. Standard of Review

Article 66, UCMJ, requires this court conduct a de novo review of the factual sufficiency of all cases it hears.[62] This "awesome, plenary, de novo power"[63] requires us to weigh all the admitted evidence and testimony at trial, make "allowances for not having personally observed the witnesses," and decide whether we are convinced of the accused's guilt beyond a reasonable doubt.[64] In doing so, we take a "fresh" and "impartial look at the evidence" and apply "neither a presumption of innocence nor a presumption of guilt."[65] This does not mean that a conviction must be "free from conflict,"[66] but it must be proved beyond a reasonable doubt—the highest standard known to the law. If the evidence admitted at trial leaves us with a "fair and reasonable hypothesis except that of guilt," we are required to set aside the conviction.[67]

### B. The Convictions Lack Factual Sufficiency

After reviewing the record, focusing solely on the admitted evidence and testimony at trial, we are not persuaded the Government proved its case beyond a reasonable doubt. "A reasonable doubt is not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in the case."[68] We do not believe the evidence eliminates every fair and reasonable hypothesis except that of guilt.

#### 1. The 0430 incident (Specification 1 of the Charge)

The Government's evidence of the 0430 encounter stems from Appellant's "bragging" to Cpl Alpha and Sgt Romeo on the ride back to Camp Pendleton. Cpl Alpha testified that Appellant's statements left her with the impression that Appellant told

---

[62] *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

[63] *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018) (quoting *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

[64] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[65] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[66] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[67] *Military Judges' Benchbook* [*Benchbook*], Dept. of the Army Pamphlet 27-9 at 2-5-12 (Sept. 10, 2014).

[68] *Benchbook* at 2-5-12 (internal quotation marks omitted)

the other two junior Marines that he and SSgt Charlie had sex "a couple of times."[69] The next day when Appellant texted SSgt Charlie, instead of confronting him about sexually assaulting her, the only thing she asked was whether he "pulled out."[70]

From this we are to make a determination, first that a sexual act occurred, namely that Appellant penetrated SSgt Charlie's vulva with his penis, and second, that it was done without her consent. On the one hand, we have Appellant's own words to Cpl Alpha that left her with the impression that there were "a couple" of different sexual encounters.[71] We also have SSgt Charlie, with no memory of an earlier encounter, inquiring as to whether Appellant ejaculated. It is unlikely Appellant ejaculated during the 0900 encounter, as it was interrupted by Cpl Alpha's knock at the door. In addition, SSgt Charlie reported no ejaculate inside of her at any time and the Government's DNA expert reported no presence of semen, though it was just outside the optimal detection window. And Appellant assured SSgt Charlie that he did not ejaculate.

Appellant's trial strategy appeared to include the adoption of the existence of an earlier consensual encounter. Even so, the Government's evidence for the existence of this earlier encounter was solely predicated on Appellant's bragging. The Government believes these statements are reliable for the existence of a sexual encounter, but then disbelieves those same statements for their characterization of the sexual encounter as consensual.

The statements, and their reliability, do not appear to be like typical statements against interest, but could be the embellished statements of an immature man who is bragging about a recent sexual conquest. Sifting through Appellant's bragging requires additional evidence to place things in context and determine what to accept and what to reject. His bragging also includes salacious details that are unknown as to whether they are true or not. And in the controlled text messaging conversation, Appellant told SSgt Charlie that she was the one who initiated.[72] The evidence leaves open the possibility that either the encounter did not happen at all, or if it

---

[69] R. at 479.

[70] *Id*. at 298.

[71] R. at 479. In closing, the trial counsel told the members that on the ride back to Camp Pendleton, Appellant told Cpl Alpha that he "got off" or "ejaculated twice." *Id*. at 691. This comports with Pros. Ex. 5 For Identification, which consisted of text messages between SSgt Charlie and Cpl Alpha. However, Pros. Ex. 5 For Identification was never admitted.

[72] In closing, the trial counsel argued that Appellant claimed SSgt Charlie "initiated" the 0900 encounter. R. at 691. Trial defense counsel claimed that "she came onto him twice. She didn't mind him being there. She initiated that." *Id*. at 701.

did, it was consensual. The existence of at least one other "fair and rational hypotheses" other than guilt precludes us from being convinced beyond a reasonable doubt that this act occurred without SSgt Charlie's consent.

### 2. The 0900 incident (Specification 2 of the Charge)

SSgt Charlie testified she awoke to the sound of Cpl Alpha's knock at the door and the realization that Appellant was aggressively penetrating her vulva with his penis. She made no indications of distress, shock, or other outward signs, but only got out of bed, put on a robe, and answered the knock at the bedroom door. SSgt Charlie testified that she last remembered wearing leggings that were similar to yoga pants, underwear, and a tank top. She testified she awoke wearing only her tank top. If she went to bed with her yoga pants on, along with the tank top she remembered wearing before going to bed, then at some point the yoga pants were removed. If Appellant removed them, then he did so either with her consent or without her knowledge and without rousing her. The same would hold true for her underwear. Because SSgt Charlie woke up without any underwear or pants on, if Appellant removed them he did not put them back on.

SSgt Charlie also testified that she followed Cpl Alpha out of the room directly when she asked to borrow a hair brush. She never testified about when she put on her underwear and leggings, or anything else on the lower part of her body. It seems improbable that she woke up naked from the waist-down as she was being sexually assaulted, got up out of bed, and left the room immediately wearing only a robe and a tank top. Cpl Alpha testified that after SSgt Charlie gave her the brush, she went to another bathroom for about "five minutes"[73] to brush her tangled hair. When she returned to the living room where Sgt Romeo was, she saw SSgt Charlie emerge from her bedroom, followed later by Appellant. Presumably, after getting the brush for Cpl Alpha, SSgt Charlie returned to her bedroom, where Appellant was, and dressed without incident. Sgt Romeo only could recall that Cpl Alpha went to the door and sometime after that SSgt Charlie and Appellant emerged from the room. He could not remember which one emerged first.

When Cpl Alpha knocked on the door and asked "Are you decent?" Appellant replied, "No. Definitely not."[74] Based on the Government's pictures of the apartment,[75] the distance from the bed to the door is at least a few feet. During the SAFE,

---

[73] *Id*. at 506.

[74] *Id*. at 475.

[75] Pros. Ex. 1.

SSgt Charlie described Appellant as "aggressively" penetrating her from behind in a spooning[76] position. This positioning would place Appellant's mouth fairly close to SSgt Charlie's ear, either during the act or immediately after. This would indicate that Appellant called out to Cpl Alpha, loud enough for her to hear, that he was "definitely not" "decent" while he was sexually assaulting his sleeping victim or, at least, just as he was nearly discovered. In addition, Appellant was sexually assaulting a sleeping staff NCO in her bed right at the time that two other junior Marines might be waking up right outside her door. Another possibility is that Appellant was engaged in a consensual sexual encounter and tried to warn Cpl Alpha that he, and SSgt Charlie, were "not decent" at the moment. After SSgt Charlie opened the door, Cpl Alpha entered the room and saw Appellant, casually covering his nudity with one of SSgt Charlie's pillows. Other than her belief that SSgt Charlie was not attracted to Appellant, she reported nothing out of the ordinary. The Government's burden here is to prove a sexual assault beyond a reasonable doubt, and in the process render the other possible consensual *in flagrante delicto* scenario fanciful conjecture. It has not.

### 3. SSgt Charlie's focus on being "blacked out"

SSgt Charlie's initial focus was on the wrongfulness of any sexual encounter that she could not recall due to being "blackout drunk." Initially, she did not mention to anyone that Appellant had sexually assaulted her when she was asleep. On the Monday after the incident, SSgt Charlie texted Ms. Victor, one of her closest friends, that she was "blackout drunk" when the "totally sober" Appellant "took advantage" of her. Confused, Ms. Victor asked her, "What do you mean? Like rape?" And SSgt Charlie replied, "I mean, *by definition*, absolutely."[77] No such technical definition would be needed had SSgt Charlie simply explained that Appellant penetrated her while she was asleep. But SSgt Charlie never confided to her friend in a private conversation the clearest example of what she later asserted was Appellant's criminal conduct.

SSgt Charlie also did not mention to Cpl Alpha that Appellant sexually assaulted her when she was asleep. Cpl Alpha was, ostensibly, a witness who interrupted that particular crime. But SSgt Charlie, according to Cpl Alpha, recalled that her text messages were only expressing frustration or unhappiness because she "didn't

---

[76] SSgt Charlie told the nurse who conducted the SAFE that Appellant was "spooning her with his arm across her chest." R. at 573.

[77] *Id.* at 550 (emphasis added).

want it."[78] There was nothing resembling a clear allegation that Appellant sexually assaulted her while she was sleeping.

Ms. Victor expressed extreme frustration that Cpl Alpha appeared to be questioning SSgt Charlie about the allegation. It seems improbable that Cpl Alpha would have expressed any such doubts had SSgt Charlie made a clear declaration that she was asleep when she was sexually assaulted, rather than a more nebulous expression that she was "too drunk."

In the controlled text conversation, the entire focus was on getting Appellant to "admit" that he knew SSgt Charlie was "too drunk" to have sex. Prior to the controlled text conversation, SA LS referenced mandatory sexual assault briefs[79] that seemed to instruct that when someone is "intoxicated" or "blackout drunk" they "cannot consent."[80] This is not the law.

A "blackout" " and a "pass-out" from intoxication are very different things. During an "alcohol-related *blackout . . .* an individual is still fully conscious" and can be "moving around, acting, engaging, talking, dancing, driving, *engaging in all kinds of behavior*, but because of alcohol's inhibition of the transfer of information from short-term memory to long-term memory, they simply will *be unable to remember those decisions* or actions they made while in the *blackout*."[81] The individual might engage in "activities which require complex cognitive abilities, but the individual might not remember the next day" and "might regret it."[82]

A "*pass-out*, on the other hand, typically occurs at (blood alcohol levels) of 0.30 or higher and occurs when the level of alcohol reaches such a high level that the part of

---

[78] *Id.* at 509.

[79] If sexual assault briefs are still leaving Marines and Sailors with this misunderstanding of the law, they should be reviewed to accurately state the law while still warning against the dangers of intoxication and other risky behaviors while on liberty.

[80] SA LS's misunderstanding of the law matches that of a Coast Guard commander during voir dire in a general court-martial for an alcohol facilitated sexual assault. The member believed that "if someone was too drunk to remember that they had sex, then they were too drunk to consent to having sex." *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016). Our superior court held this "misunderstanding of the law" constituted bias.

[81] *United States v. Pease*, 74 M.J. 763, 769 (N-M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016) (emphasis added). The quote was from the expert toxicologist in *Pease*, which is the generally accepted scientific explanation between "black-out" and "pass-out" from intoxication, including in the present case.

[82] *Id.*

the brain that controls consciousness has literally shut down, so those individuals have lost consciousness and would not be easily roused."[83] "The SAPR-perpetuated 'one drink and you can't consent' axiom," seemingly adopted by SA LS, "is not the standard."[84]

We find the convictions factually insufficient. There is too much reasonable doubt associated with the evidence in this case. It leaves open a "fair and reasonable hypothesis other than that of guilt." The Government's obligation is to prove its case beyond a reasonable doubt. It did not.

## CONCLUSION

The findings and sentence are **SET ASIDE**. The charge and specifications are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property of which Appellant has been deprived due to the findings and sentence are ordered restored. UCMJ arts. 58b(c), 75(a).

Judge STEWART concurs.

---

[83] *Id*. (emphasis added).

[84] *United States v. Newlan*, No. 201400409, 2016 CCA LEXIS 540 at *19 (N-M. Ct. Crim. App. Sept. 13, 2016) (unpub. op.). "SAPR" stands for Sexual Assault Prevention and Response.

GASTON, Senior Judge (dissenting):

I disagree with my colleagues that the evidence is factually insufficient to support Appellant's convictions. When making such an assessment, a reviewing court must recognize that it did not observe the witnesses in determining whether there is proof beyond a reasonable doubt, the standard of which "does not mean the evidence must be free from conflict." *United States v. Rankin*, 63 M.J. 552, 557 (C.A.A.F. 2006).

My concern, however, is with the unfair manner in which Appellant's convictions were obtained. I would decide this case on the second and third assignments of error, would find prejudicial error on both, and would reverse and remand.

## I. DISCUSSION

### A. Prosecutorial Misconduct

As the majority notes, the subject of the bruising on Staff Sergeant (E-6) [SSgt] Charlie's[1] inner thighs came up during pretrial litigation. In order to defend against any inference that the bruising was caused by Appellant, the Defense moved to compel an expert on bruising and to introduce alternate-source-of-injury evidence under Military Rule of Evidence [Mil. R. Evid.] 412. As a means of resolving the pretrial litigation on both issues, the trial counsel unequivocally "agreed not to introduce evidence or testimony regarding bruising discovered on the inner thighs and legs of [SSgt Charlie]."[2] Relying upon this promise, the Defense thereupon withdrew both motions.[3]

At trial, the trial counsel then did precisely what he had agreed not to do: elicited testimony from SSgt Charlie that following the alleged assault she had bruising on her inner thighs. The Defense immediately objected, arguing the trial counsel was acting contrary to his earlier assurance.

---

[1] All names are pseudonyms.

[2] App. Ex. XLII at 1. The Defense memorialized the trial counsel's assurance on the record, informing the military judge, "The government agreed not to enter—or not to seek to enter any evidence of the bruising on the inside of [SSgt Charlie's] legs." R. at 54. The trial counsel made no attempt to correct the Defense's stated understanding of the Government's assurance in this regard.

[3] App. Ex. XLII at 1.

During the ensuing Article 39(a) session, the trial counsel, rather than honor his earlier agreement and join the Defense request that the members be instructed to disregard the testimony, instead fought successfully to keep it admitted in evidence. First, he responded that the Government only intended to use the evidence to demonstrate SSgt Charlie's lack of memory—which bore on the issues of her impairment and consent at the time of the alleged assaults—not to argue Appellant was responsible for the bruising or that it happened during the alleged assaults. Second, he did not join the Defense request that the military judge affirmatively instruct the members that Appellant did not cause the bruising, arguing that ultimately the cause of the bruising was unknown.

The Defense argued the testimony was at best minimally relevant to the issue of SSgt Charlie's intoxication level, that its probative value on that issue was low in light of other evidence bearing on the same issue, and that its low probative value was substantially outweighed by the danger of unfair prejudice since "[w]ithout providing an explanation as to the source of the injury, it will be natural for the members to infer that it was a result of the alleged assault."[4] To guard against this inference, in addition to objecting to its admission altogether, the Defense requested that, if the testimony were allowed to stand, the military judge instruct explicitly that the injuries were not caused by Appellant.[5]

The military judge overruled the Defense objection (without addressing the issue of the Defense's detrimental reliance on the trial counsel's promise), let the testimony stand, and gave only the following limiting instruction over Defense objection:

> You just received some testimony that [SSgt Charlie] experienced some inner-thigh bruising, and that evidence has been admitted for the limited purpose for you to consider when you consider her level—or her state of intoxication on the night in question. You may not consider this evidence for any other purpose, including—you may not consider it for the purpose of deciding that [Appellant] caused those injuries. You do not have that information in front of you. So the only purpose for which you can consider the inner-thigh bruising is for consid-

---

[4] R. at 274.

[5] Operating in the background of this discussion, of course, was the fact that based on the trial counsel's earlier promise, the Defense abandoned its motions to compel an expert on bruising and to admit alternate-source-of-injury evidence under Military Rule of Evidence 412 to defend against any inference that the inner-thigh bruising was caused by Appellant.

eration of what [SSgt Charlie]'s level of intoxication may have been that evening and, again, for no other purpose.[6]

Appellant asserts the trial counsel's actions constitute prosecutorial misconduct. We review such issues de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018). When properly objected to at trial, as here, we review them for prejudicial error. *Id.*

Prosecutorial misconduct occurs when a prosecutor "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). In general, such misconduct is "defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger,* 295 U.S. at 88.). As the Supreme Court stated long ago:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger,* 295 U.S. at 88, *quoted in Fletcher*, 62 M.J. at 179.

I would find prosecutorial misconduct on the facts here. In unequivocal terms, the trial counsel promised not to introduce evidence of inner-thigh bruising to the alleged victim in a sexual assault case charging, among other things, nonconsensual vaginal penetration; thereby induced the Defense to withdraw motions aimed at defending against that evidence; and then reneged on that promise and introduced the evidence at trial anyway. This conduct clearly overstepped the bounds of propri-

---

[6] R. at 277-78.

25

ety and fairness that should characterize the conduct of such an officer in the prosecution of a criminal offense.

Having found misconduct, we then test for prejudice. "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Fletcher*, 62 M.J. at 184 (citing *Meek*, 44 M.J. at 5). In this regard, "it is not the number of legal norms violated but the impact of those violations on the trial which determines the appropriate remedy for prosecutorial misconduct." *Id.* (quoting *Meek*, 44 M.J. at 6). Assessing the prejudicial impact of prosecutorial misconduct on a trial involves the balancing of three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* While prosecutorial misconduct does not automatically mandate dismissing charges or ordering a rehearing in every case where it has occurred, "an appellate court usually considers the legal norm violated by the prosecutor and determines if its violation actually impacted on a substantial right of an accused (*i.e.*, resulted in prejudice)." *Meek*, 44 M.J. at 5. "If it did, then the reviewing court . . . considers the trial record as a whole to determine whether such a right's violation was harmless under all the facts of a particular case." *Id.* (footnote omitted).

Applying the *Fletcher* factors, I would first find that the misconduct was severe. The trial counsel's promise was made under circumstances calculated to induce the Defense to waive specific motions aimed at confronting particularly prejudicial evidence in a contested trial. When SSgt Charlie testified about the bruising, the record reveals no indication of surprise on the part of the trial counsel, who upon the Defense's predictable objection immediately fought to keep in the evidence he had promised never to offer in the first place. As a result, having been lured into abandoning its pretrial motions, the Defense was left flat-footed and ill-equipped to defend against evidence it had been assured it would not have to confront at trial. Such conduct is far beyond the pale of fair play in a court of law.

Second, I would find the measure adopted to cure the misconduct—providing an insufficient limiting instruction—was an inadequate means of addressing such blatant unfairness by the Government, which should not have been allowed to profit one iota from the trial counsel's misconduct. Based on the record as a whole, the circumstances called for, at the very least, *striking* the testimony and giving a *curative* (as opposed to a limiting) instruction that advised the members that the evidence was improperly elicited, was completely irrelevant to the case as there was no evidence whatsoever to indicate that the accused had caused the injuries or that they occurred during the incident in question, and to disregard the testimony entirely. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) ("A curative instruction is the 'preferred' remedy for correcting error when the court members have heard inadmissible evidence, as long as the instruction is adequate to avoid prejudice to the accused."). Allowing the testimony to stand with a mere limiting instruc-

tion did not remedy the prejudice to Appellant caused by the trial counsel's misconduct.

Instead, at best, the military's judge's limiting instruction—which ordinarily the members are presumed to follow absent evidence to the contrary[7]—enabled the Government to capitalize on its broken promise and use the bruising evidence as additional proof of SSgt Charlie's impairment by alcohol on the night in question, which bore on the consent element of the bodily-harm specification of which Appellant was convicted. In doing so, it sanctioned the Government's unfair inducement of the Defense to withdraw its motions designed to confront the evidence, deprived the Defense of the ability to use other evidence and expert testimony to argue the bruising was caused at some other time, and undermined the fairness and integrity of Appellant's trial.

At worst, addressing the trial counsel's misconduct in this manner undermined the fairness and integrity of Appellant's trial in a much more fundamental way, since the limiting instruction the military judge gave was itself problematic. The members were instructed that they could consider the inner-thigh bruising for purposes of assessing SSgt Charlie's intoxication level, but not "for the purpose of deciding that [Appellant] caused those injuries," inexplicably then advising: "*You do not have that information in front of you.*"

The implication of the above italicized language is that there was "information" about whether Appellant caused the bruising that the members were not privy to, which raised precisely the specter that the Defense had filed pretrial motions to guard against—*i.e.*, the inference that Appellant had caused SSgt Charlie's inner-thigh bruising during nonconsensual vaginal intercourse. As this Court has recently stated, even "the power of standard *curative* instructions to 'unring' the bell of objectionable argument or other trial errors is not unlimited." *United States v. Nichol*, No. 201800286, 2020 CCA LEXIS 178, at *47 (N-M. Ct. Crim. App. May 28, 2020) (unpub. op.) (quoting *United States v. Diaz*, 59 M.J. 79, 93 (C.A.A.F. 2003)) (emphasis added). In this case, far from "unringing" the bell of the trial counsel's misconduct, the military judge's limiting instruction amplified its prejudicial reverberations.

The bruising evidence's potential for unfair prejudice was inordinately high, particularly in light of SSgt Charlie's testimony that she awoke to Appellant "aggressively" penetrating her vulva with his penis and her report of "vaginal tenderness"

---

[7] *See United States v. Sewell*, 76 M.J. 14, 19 (C.A.A.F. 2017).

during her sexual assault forensic exam.[8] On these facts, it would be extraordinarily difficult *not* to consider evidence of bruising to the alleged victim's *inner thighs* as bearing in some fashion on the element of consent in the bodily-harm specification of which Appellant was convicted. Weighed against this high potential for prejudice, the evidence's probative value was comparatively low regarding SSgt Charlie's intoxication level, for which there were many other sources of evidence. While we give a military judge's articulated reasoning under Military Rule of Evidence 403 great deference,[9] here the probative value of the bruising evidence, and how it was presented at trial, was substantially outweighed by the danger of unfair prejudice to such a degree that allowing the testimony to stand with only this limiting instruction was a clear abuse of discretion.[10]

Third, regarding the weight of the evidence supporting the conviction, the impact of the bruising evidence was to the bodily-harm (*i.e.*, nonconsensual sexual intercourse) specification, which the parties at trial agreed and the evidence supports related to the incident occurring around 0430.[11] As the majority discusses, the evidence for this specification was not strong. While SSgt Charlie had rebuffed Appellant's advances in the past, she had no memory of whether any sexual act occurred around this time, let alone whether, as Appellant maintained, she not only consented to sexual intercourse but also instigated it. The Defense's expert psychologist testified both that alcohol lowers inhibitions and that someone operating in a state of "alcohol blackout"[12] can willingly engage in a variety of complex actions,

---

[8] R. at 255, 575.

[9] *See United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998) ("Where a military judge properly conducts the balancing test under Mil. R. Evid. 403, we will not overturn his decision unless there is a clear abuse of discretion.").

[10] I emphasize that this is testimony that, based on the circumstances surrounding the trial counsel's unequivocal pretrial promise, should have been stricken on that basis alone.

[11] R. at 727. To the extent the bodily-harm specification can be applied to the second incident around 0900, when SSgt Charlie testified she woke up to Appellant penetrating her vaginally from behind, the evidence supports finding nonconsensual intercourse only by virtue of the fact that "a sleeping person cannot consent." This is the same misconduct Appellant was convicted of under the other specification charging him with committing the sexual act upon SSgt Charlie when he knew or reasonably should have known she was asleep. Narrowed to that conduct, the bodily-harm specification would be multiplicious with the other specification (and would warrant dismissal on that basis). Hence, I consider the bodily-harm specification as only applying to the alleged assault occurring around 0430.

[12] *Id.* at 631.

appearing normal in most respects to those around them, and simply not retain long-term memories of what they did.

While the evidence supports that SSgt Charlie was noticeably intoxicated when she left the bar at 0200, she appeared to be more coherent and sober by the time her civilian friends left her apartment around 0300, and she was able to remove her contact lenses before going to bed later that morning. This evidence supports that while she was in a state of alcohol blackout when she went to bed (which would explain her inability to remember events during this period), it is uncertain at best whether she was actually impaired to the point of incompetency at the time of the alleged assault around 0430 (to the extent this time can be relied upon, which is itself uncertain based on the evidence).[13] And there is little or no evidentiary basis upon which to ascertain whether she was asleep, as opposed to simply not forming long-term memories due to alcohol blackout, at that time.[14]

Based on this assessment of the *Fletcher* factors, and considering the trial record as a whole, I cannot say the impact of the bruising evidence on Appellant's conviction of the bodily-harm specification was "harmless under all the facts of [this] particular case." *Meek*, 44 M.J. at 5. To the contrary, I believe the evidence of bruising on SSgt Charlie's inner thighs prejudiced Appellant by providing additional support for the Government's theory that, in one way or another, SSgt Charlie did not consent to being vaginally penetrated by Appellant.

I would further find that the Government gained this additional evidentiary support by unfairly inducing the Defense to forego Appellant's rights to both a potential fact witness to provide alternate-source-of-injury testimony and an expert witness to explain the nature of the bruising observed. As to the former, "[t]he Fifth and Sixth Amendments to the Constitution give an accused the right to present the testimony of relevant witnesses." *United States v. Powell*, 49 M.J. 220, 225 (C.A.A.F. 1998) (citing *United States v. Miller,* 47 M.J. 352, 359 (C.A.A.F. 1997)). As to the latter, Fifth Amendment Due Process requires that expert assistance be provided to the Defense when shown to be necessary on a substantial issue in the case. *Ake v.*

---

[13] Finding that SSgt Charlie was in alcohol blackout is consistent with the members' finding Appellant not guilty of penetrating SSgt Charlie's vulva with his penis when he knew or reasonably should have known that she was "unaware" that the sexual act was occurring due to her exhaustion and intoxication.

[14] The parties at trial agreed and the evidence supports that the specification alleging sexual assault by virtue of SSgt Charlie being asleep was for the incident occurring around 0900, which comports with SSgt Charlie's testimony that she woke up to Appellant penetrating her around that time. R. at 727.

*Oklahoma*, 470 U.S. 68 (1985). The prosecutorial misconduct here infringed on each of these constitutional rights, and thus the error complained of is constitutional, requiring that "rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable possibility* that the error *might have contributed* to the [outcome]." *United States v. Tovarchavez*, 78 M.J. 458, 462 n.5 (C.A.A.F. 2019) (emphasis in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Based on the facts and circumstances presented, I am even less convinced that there was *no reasonable probability* that the trial counsel's unfair conduct *might have contributed* to Appellant's conviction of the bodily-harm specification.

I would therefore conclude that the remedy for such prejudicial error, which irrevocably undermined the fairness and integrity of Appellant's court-martial regarding the bodily-harm specification, is to set aside Appellant's conviction of that specification.

**B. Motion to Compel Special Agent LS**

Appellant also asserts that the military judge erred by denying his motion to compel Special Agent [SA] LS—the lead Naval Criminal Investigative Service [NCIS] agent during the initial investigation of this case—to provide in-person testimony at Appellant's court-martial. We review denial of requests for production of witnesses for an abuse of discretion. *Powell*, 49 M.J. at 225. A ruling based on an erroneous view of the law constitutes an abuse of discretion. *United States v. Griggs*, 61 M.J. 402, 406 (C.A.A.F. 2005) (citing *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003)). It is also an abuse of discretion if the military judge: (1) "predicates his ruling on findings of fact that are not supported by the evidence"; (2) "uses incorrect legal principles"; (3) "applies correct legal principles to the facts in a way that is clearly unreasonable"; or (4) "fails to consider important facts." *United States v. Commisso,* 76 M.J. 315, 321 (C.A.A.F. 2017) (citing *United States v. Ellis,* 68 M.J. 341, 344 (C.A.A.F. 2010); *United States v. Solomon,* 72 M.J. 176, 180-81 (C.A.A.F. 2013)).

"The Fifth and Sixth Amendments to the Constitution give an accused the right to present the testimony of relevant witnesses." *Powell*, 49 M.J. at 225 (citing *Miller,* 47 M.J. at 359). Congress has mandated that the parties at a court-martial shall have "equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Art. 46(a), UCMJ. The President has prescribed that each party shall be "entitled to production of any witness whose testimony on a matter in issue on the merits . . . would be relevant and necessary." Rule for Courts-Martial [R.C.M.] 703(b)(1). A witness' testimony is "relevant" if it has a tendency to make a fact of consequence in determining the action more or less probable than it would without the evidence. Mil. R. Evid. 401. It is "necessary"

when it "is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(b)(1), Discussion.

Our superior court has developed a non-exhaustive list of factors to consider in assessing whether a witness must be produced for in-person testimony:

> [1] the issues involved in the case and the importance of the requested witness as to those issues; [2] whether the witness is desired on the merits or the sentencing portion of the trial; [3] whether the witness' testimony would be merely cumulative; and [4] the availability of alternatives to the personal appearance of the witness, such as deposition, interrogatories or previous testimony.

*United States v. Tangpuz*, 5 M.J 426, 429 (C.M.A. 1978). In examining the issues involved in the case and the importance of the requested witness as to those issues, courts determine whether the testimony sought to be elicited would "negate the [g]overnment's evidence or . . . support the defense." *United States v. Jefferson*, 13 M.J. 1, 3 (C.M.A. 1982) (alteration in original) (citation omitted). Courts also analyze the extent to which the testimony to be elicited goes "to the core of the accused's defense." *United States v. Sweeney*, 34 C.M.R. 379, 384 (C.M.A. 1964) (quoting *United States v. Thornton*, 24 C.M.R. 256, 260 (C.M.A. 1957)).

To assess whether relevant testimony by a witness would be "merely cumulative" with that of another witness, courts look at (a) the similarity of the witnesses' testimony; (b) the comparative credibility of the requested witness; (c) whether the requested witness' testimony is relevant to character traits or other material evidence observed during periods of time different than that of the other witness; and (d) whether there is any benefit to the accused from an additional witness saying the same thing that other witnesses have already said. *United States v. Jones*, 20 M.J. 919, 927 (N.M.C.M.R. 1985). In this regard, fact witnesses "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Mil. R. Evid. 602. Consequently, unlike trial counsel or other court-martial participants, "[w]itnesses . . . are not fungible. Their testimony (or other ephemeral evidence) is unique, and it cannot be replicated by just any capable individual." *United States v. Royster*, 42 M.J. 488, 490 (C.A.A.F. 1995).

While this overall assessment considers whether there are alternatives to the witness' personal appearance, such alternatives generally cannot be forced upon an unwilling accused. For example, an accused cannot be forced to call a relevant and necessary witness on the merits via remote means, as such remote testimony requires the consent of both parties and "will not be admissible over the accused's objection as evidence on the ultimate issue of guilt." R.C.M. 703(b)(1). Similarly, while it may be true that "[a] matter is not in issue when it is stipulated as a fact," R.C.M. 703(b)(1), Discussion, our superior court has long held that: "[a]n accused

cannot be forced to present the testimony of a material witness on his behalf by way of stipulation or deposition. On the contrary, he is entitled to have the witness testify directly from the witness stand in the courtroom." *Sweeney*, 34 C.M.R. at 383 (quoting *Thornton*, 24 C.M.R. at 259). Hence, the general rule is that a witness determined to be relevant and necessary must be produced at trial.

The principal exception to this general rule is that "a party is not entitled to the presence of a witness who is *unavailable* within the meaning of Mil. R. Evid. 804(a)." R.C.M. 703(b)(3) (emphasis added). The definition of "unavailable" under Mil. R. Evid. 804(a)(6) includes a witness who is "unavailable within the meaning of Article 49(d)(2)," which, in turn, means: "that the witness by reason of death, age, sickness, bodily infirmity, imprisonment, *military necessity*, nonamenability to process, or other reasonable cause, is unable or refuses to appear and testify in person at the place of trial or hearing." Article 49(d)(2), UCMJ (emphasis added). To ascertain whether a witness is unavailable due to military necessity or some other aspect of this definition, courts look at such additional factors as whether the witness is subject to the government's subpoena power (particularly as it relates to crossing international boundaries), whether the requested witness is in the armed forces or otherwise subject to military orders, and "the effect that a military witness's absence will have on his or her unit and whether that absence will adversely affect the accomplishment of an important military mission or cause manifest injury to the service." *Jones*, 20 M.J. at 926.

Finally, even if a witness found to be relevant and necessary has been determined to be unavailable, that does not end the analysis. Courts then proceed to the following rule:

> [I]f the testimony of a witness who is unavailable is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such testimony, the military judge shall grant a continuance or other relief in order to attempt to secure the witness' presence or shall abate the proceedings, unless the unavailability of the witness is the fault of or could have been prevented by the requesting party.

R.C.M. 703(b)(3). Thus, the failure to produce such centrally important witnesses, for whose testimony there is no adequate substitute, generally prevents the trial from going forward unless and until the situation is remedied in some fashion.

Here, the witness at issue, SA LS, was the lead NCIS case agent during the critical initial phase of a sexual assault investigation. She interviewed SSgt Charlie and other key witnesses, advised SSgt Charlie during monitored text messaging with Appellant, and completed various other investigative actions, including overseeing the unsuccessful extraction of cellular phone data that ultimately failed to secure SSgt Charlie's text-message conversations with other witnesses immediately follow-

ing the alleged assaults. After the data extraction was conducted and the phone was returned to her, SSgt Charlie deleted many of her text messages, later maintaining SA LS told her it was okay to do so. Thus, as there were problems with the data extraction, SA LS had personal knowledge both of how SSgt Charlie's documented statements to other material witnesses had been lost and of the fact that, contrary to what SSgt Charlie maintained, NCIS never told her she could delete such material evidence from her phone.[15]

Predictably, the Defense moved to compel in-person testimony at trial from SA LS as relevant to "the thoroughness, integrity, and competency of the investigation" and pertinent to "critical evidence being lost or destroyed."[16] After a hearing, the military judge denied the Defense motion, finding SA LS's testimony relevant but not necessary based on the conclusion that it was cumulative of other witnesses' testimony. At trial the Defense moved the military judge to reconsider his ruling after SSgt Charlie testified that in conjunction with her interview by SA LS she was told she could delete her text messages.[17] The military judge denied the motion to reconsider on much the same grounds as he had denied the original motion to compel.

I would find the military judge's ruling to be an abuse of discretion for a number of reasons. First, in response to the Defense's argument that SA LS's testimony was necessary to support its theory that the NCIS investigation was conducted in an incompetent, perfunctory manner that was biased against Appellant, the military judge stated, "I don't understand why that's important," and that the Defense lacked a good-faith basis to pursue such a theory.[18] This reasoning ignores crucial facts, including: (1) SA LS's comments to SSgt Charlie during the monitored text messaging with Appellant which revealed an open-and-shut approach to Appellant's guilt, based on (a) an incorrect understanding of the law of impairment by alcohol and (b) a particular interpretation of text messages that can be read multiple ways; (2) SA LS's personal knowledge of NCIS's failed attempts to competently extract cell

---

[15] *See* App. Ex. XIX at 11; Appellant's Motion to Attach, dated 15 July 2019, Encl. (3), Decl. of LT Gregory R. Hargis, dated June 18, 2019, at 2 ("[SA LS] stated she did not tell the alleged victim, [SSgt Charlie], to delete text messages or that it would be okay to delete text messages. [SA LS] stated that she was the only NCIS agent interviewing [SSgt Charlie] during the first interview, and that [the follow-on NCIS case agent] later came onto the case.").

[16] App. Ex. XIX at 4.

[17] R. at 264-65.

[18] *Id.* at 84.

phone data, which led to the loss of SSgt Charlie's text messages discussing the incident before she viewed it as a sexual assault; and (3) the fact that SA LS's testimony would *contradict* SSgt Charlie's testimony about whether she was told she could delete these material text messages from her phone. These facts went to the core of the Defense case—that the NCIS investigation was not competent and SSgt Charlie was not credible—and SA LS's testimony bore on both issues.

Second, the military judge ultimately found SA LS's testimony cumulative of the testimony of the follow-on lead NCIS agent on the case, because "NCIS agents are fungible. They document everything."[19] This reasoning is in direct conflict with the law, which holds that because their testimony must be based on personal knowledge, "witnesses . . . are *not* fungible." *Royster*, 42 M.J. at 490 (emphasis added). One can see why this is so here. While it may be true that NCIS agents document their investigative actions in written reports, no follow-on case agent could testify from a report as to what SA LS personally observed during the course of her investigation, her reasoning for the investigative steps she took or did not take, or the fact that, contrary to what SSgt Charlie later maintained, SA LS never told her it was okay to delete her text messages.[20]

Third, in response to the Defense's argument that in-person testimony was required, the military judge first stated that:

> the fact that the Defense is not willing to allow for remote testimony for Special Agent [Sierra] simply reinforces this Court's decision or ruling that they don't really believe that her testimony is that important. Because if it was that important and that critical, then they would probably authorize the remote testimony of [SA LS].[21]

The military judge then noted the Government's willingness to stipulate to at least a portion of what the Defense sought to elicit from SA LS, stating, "that means that it is not a matter in issue and, therefore, not relevant testimony. So that's just an additional basis as to why I'm having difficulty understanding the importance and the relevance and necessity in this particular witness."[22]

---

[19] *Id.* at 92.

[20] Thus, the ruling's further conclusion that SA LS's testimony was cumulative of SSgt Charlie's testimony, when in fact the two witnesses contradicted each other on this point, was clearly erroneous.

[21] R. at 92.

[22] *Id.* at 85-86.

Both of these rationales are based on an erroneous view of the law in the way they consider alternatives to in-person testimony. While the availability of alternatives to in-person testimony may generally be taken into consideration for witness production issues, it is error to suggest that the law forces an accused into a Catch-22,[23] where refusing to agree to remote testimony or a stipulation can be taken to mean the requested in-person testimony is not important enough to be relevant and necessary (because if the testimony were really relevant and necessary then surely the accused would agree to remote testimony or a stipulation). Rather, the law holds just the opposite, that an accused ordinarily may *not* be forced either to call a relevant and necessary witness on the merits via remote means, or to present material witness testimony by way of a stipulation or other alternative to in-person testimony.

Fourth, to the extent the military judge's ruling is based on SA LS's unavailability (which he discussed despite finding her testimony cumulative and thus unnecessary), it is predicated on findings of fact that are not supported by the evidence. In assessing her unavailability, the military judge relied essentially on the prospective witness' own email to trial counsel in which she summarily stated she was deployed to the NCIS office at Camp Lemonnier, Djibouti, and "due to Op tempo and being short staffed" was unable to travel back to the United States.[24] Aside from this email, there is little or no evidence as to why the initial lead NCIS agent on a sexual assault investigation could not break away from other duties for a few days in order to testify at a general court-martial—where the accused was facing felony-level offenses carrying a maximum of 90 years' confinement—particularly when the trial had already been continued for several weeks.[25] The best the trial counsel could offer was that SA LS "at least is *under the impression* that she needs to be at Camp Lemonnier. There's not a way for her to leave."[26]

A witness' unavailability—which is a question for the court, not the witness—must not be assessed in such a conclusory fashion, particularly where nothing in the

---

[23] Catch-22, a phrase from the novel *Catch-22* (1961) by Joseph Heller, is defined as a "problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule." *Webster's Ninth New Collegiate Dictionary* 215 (9th ed. 1991), *quoted in United States v. Warner*, 62 M.J. 114, 122 n.39 (C.A.A.F. 2005).

[24] App. Ex. XX at 10.

[25] And even if that were the case, the record demonstrates that the witness' deployment was due to end within a couple of months, after which there appeared to be no impediment whatsoever to her in-person testimony.

[26] R. at 90 (emphasis added).

record supports what, if any, adverse impact this government agent's absence for a few days would have had on the mission of that particular NCIS office or the United States military installation it services. Absent actual evidence of the impact that the witness' absence would have on her unit or the accomplishment of an important military mission, manifest injury to the service, significant travel restrictions, or other reasonable grounds, the evidentiary basis here is insufficient to support a finding that the witness was unavailable to testify at Appellant's trial.

Finally, while the military judge did not reach this question because he erroneously found her testimony cumulative, even assuming SA LS were properly determined to be unavailable, the trial court must still consider whether the testimony of a relevant and necessary, but unavailable, witness is of such central importance to an issue that it is essential to a fair trial and whether there is an adequate substitute for her testimony. R.C.M. 703(b)(3). As discussed above, SA LS's testimony went to the core of Appellant's defense. As the original lead NCIS agent on the case, she interviewed SSgt Charlie and other key witnesses, made comments suggesting she believed Appellant was guilty from the start, inserted an inaccurate understanding of the law into monitored text-message exchanges, oversaw the unsuccessful extraction of material text messages from SSgt Charlie's cell phone, and would have specifically contradicted SSgt Charlie's testimony that NCIS told her it was okay to delete her text messages (resulting in their permanent loss). It is no stretch to say SA LS would have been the centerpiece of the Defense's presentation of its case that the NCIS investigation was incompetent and biased.

Thus, SA LS's testimony would have negated the Government's evidence and supported the Defense, particularly as it related to SSgt Charlie's credibility—the importance of which was not lost on the Government, which called a witness specifically to testify about SSgt Charlie's character for truthfulness.[27] Courts have found that witnesses testifying to good character alone can be centrally important where good character goes to the core of the accused's defense. *See Sweeney*, 34 C.M.R. at 384-85. Hence, it stands to reason that a witness whose testimony *challenges* the Government's good character evidence can also be centrally important where it goes to the core of an accused's defense.

I would find that in the context of this case, SA LS's testimony was of such central importance to the core issues of Appellant's defense that her in-person testimony was essential to a fair trial. I would also find that there was no adequate substitute for her testimony, such that the military judge should have granted a continuance or taken other steps as necessary to secure her presence at trial. I would

---

[27]*Id.* at 671.

therefore conclude that the failure to produce her for in-person testimony at trial was an abuse of discretion.

"Because an erroneous refusal to order production of a necessary and material witness violates the Fifth and Sixth Amendments, as well as R.C.M. 703, we may not affirm unless we are satisfied beyond a reasonable doubt that the error was harmless." *Powell*, 49 M.J. at 225. That determination requires the reviewing court to "decide if the evidence of record demonstrates beyond a reasonable doubt that the unadmitted testimony would not have tipped the balance in favor of the accused and the evidence of guilt is so strong as to show *no reasonable possibility* of prejudice." *Id.* (emphasis added) (citations and internal quotation marks omitted).

Here, Appellant's other conviction—of the specification alleging he committed a sexual act upon SSgt Charlie when he knew or reasonably should have known she was asleep—hinged entirely on the credibility of SSgt Charlie's testimony that she woke up to Appellant penetrating her.[28] That credibility already faced a number of challenges at trial. First, while she appeared uncomfortable during the group conversation in her apartment, her reaction could be explained by the fact that she had just been found in an embarrassing situation with a junior Marine. Second, in neither that morning's conversation in her apartment nor the subsequent text messages with Appellant and Corporal [Cpl] Alpha over the weekend (which were subsequently deleted) did SSgt Charlie allege or appear to view what happened as a sexual assault; instead, according to Cpl Alpha, she was upset about having had sex with Appellant and said she didn't want it, but "[i]t was just that she [SSgt Charlie] was like, 'Crap.'"[29] Third, SSgt Charlie apparently (and justifiably) became more upset when she found out Appellant was telling other Marines, in vulgar terms, about her behavior during sexual intercourse, which would provide strong motive for her to fabricate an allegation against him. Fourth, after later deciding to report what happened as a sexual assault, SSgt Charlie gave her phone to NCIS for data extraction and subsequently deleted her initial text-message exchanges with Cpl Alpha from her phone (which resulted in the permanent loss of this material evidence when the NCIS extraction attempts were not successful).

In this context, the issue of whether SSgt Charlie was told she could delete her text messages was of great import, as was the *contradiction* between SA LS's and

---

[28] In addition to being the incident clearly supported by this testimony from SSgt Charlie, the parties agreed at trial that the specification alleging sexual assault by virtue of SSgt Charlie being asleep was for the alleged assault occurring around 0900. R. at 727.

[29] *Id.* at 509.

SSgt Charlie's testimony on this point. Irrespective of whom the members may ultimately have believed in this regard, the failure to produce SA LS left the Defense no ability to develop even the contradiction itself, let alone further develop (and argue) who was telling the truth, who was lying, and why. This predicament consequently deprived the Defense of the ability to develop the other underlying issues that were crucial to its case—whether involving the complaining witness or the lead NCIS agent—which would have cast both the credibility of SSgt Charlie's allegation and the integrity of the NCIS investigation in a starkly different light than was presented at trial.

Under these circumstances, I am unable to conclude based on the record that SA LS's testimony would not have tipped the balance in favor of Appellant or that the evidence of Appellant's guilt on the remaining specification is so strong as to show *no reasonable possibility* of prejudice. To the contrary, I believe SA LS's testimony would have supported both issues at the core of Appellant's defense in a way that was entirely absent without her testimony. Creating such a gap in an accused's defense at trial, the alleviation of which would have required at most a continuance (and probably the mere threat of one, if calling the witness on the motion did not itself resolve the availability issue), is doubly hard to swallow when the witness at issue was the initial *lead NCIS agent* who took the actions described herein. As it stands, SA LS was erroneously not produced, the lack of her in-person testimony prejudiced Appellant's defense at trial, and such prejudice requires an appropriate remedy, which I would conclude is to dismiss the remaining specification of which Appellant was convicted.

## III. CONCLUSION

Based on the foregoing, I would set aside the findings and sentence and authorize a rehearing. Accordingly, I dissent.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court